[No. B136688. Second Dist., Div. Three. Nov. 2, 2001.]

ELIZABETH SMITH et al., Plaintiffs and Appellants, v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY et
al., Defendants and Respondents.

**COUNSEL**

Mark P. Robinson; Cheong, Denove, Rowell, Antablin & Bennett and John D. Rowell for Plaintiffs and Appellants.

LeBoeuf, Lamb, Greene & MacRae, Sanford Kingsley and Thomas E. McDonald for Defendant and Respondent United Services Automobile Association.

Thelen Reid & Priest, Gary L. Fontana and Hilary N. Rowen for Defendant and Respondent 20th Century Insurance Company.

Heller Ehrman White & McAuliffe, Paul Alexander, Vanessa Wells and James R. Knox for Defendants and Respondents State Farm Mutual Automobile Insurance Company, Allstate Insurance Company, Allstate Indemnity Company and California Causalty Insurance Company.

Barger & Wolen, Kent Keller, Steven H. Weinstein and John C. Holmes for Defendant and Respondent California State Automobile Association Inter-Insurance Bureau.

Morrison & Foerster, John P. Olson; Skadden, Arps, Slate, Meagher & Flom and Raoul D. Kennedy for Defendants and Respondents Farmers Insurance Exchange and Safeco Insurance Company of America.

Sonnenschein Nath & Rosenthal, Paul E. B. Glad and John L. Williams for Defendants and Respondents Colonial Penn Auto Insurance and Colonial Penn Madison Insurance Company.

Robert M. Wright, William J. Moran and John K Beckley for Defendant and Respondent Interinsurance Exchange of the Automobile Club of Southern California.

## OPINION

**CROSKEY, J.**—In this class action, the representative plaintiffs[1] allege that the defendant insurers[2] conspired together to require their customers, who sought liability coverage on multiple vehicles, to either purchase uninsured motorist coverage for *each* vehicle or waive it as to *all* vehicles. Plaintiffs alleged that the defendant insurers claimed that this result was compelled by applicable law. The defendant insurers repeatedly demurred to the plaintiffs' complaint. Finally, the trial court concluded that the third amended complaint failed sufficiently to allege a conspiracy by or among the defendant

---

[1] The representative plaintiffs listed in the class action complaint before us are Elizabeth Smith, Paul Armendariz, Osvelia Blanco Seiling, Patricia Grace, Joanne Hamilton, Ralph Arzate and Shelly Mossanen. We will hereafter collectively refer to these parties as the plaintiffs (which term, where appropriate, shall also include other class members—there has as yet been no class certification). We will hereafter refer to the individual representative plaintiffs by their last names (e.g., the plaintiff Smith, or simply Smith).

[2] The named insurer defendants are State Farm Mutual Automobile Insurance Company, sued herein as State Farm Insurance Group (State Farm), Farmers Insurance Exchange, sued herein as Farmers Insurance Group (Farmers), Allstate Insurance Company and Allstate Indemnity Company, sued herein as Allstate Insurance Group (Allstate), California State Automobile Association Inter-Insurance Bureau (CSAA), 20th Century Insurance Company, Interinsurance Exchange of The Automobile Club, sued herein as SoCal AA (Interinsurance Exchange/Auto Club (Auto Club), Mercury Insurance Company (Mercury [did not participate in this appeal]), Safeco Insurance Company of America, sued herein as Safeco Insurance Companies (Safeco), California Casualty Insurance Company, sued herein as California Casualty (California Casualty), Colonial Penn Madison Insurance Company, sued herein as Colonial Penn Auto Insurance (Colonial Penn) and United Services Automobile Association, sued herein as USAA (USAA) (collectively the defendant insurers).

insurers to engage in any unlawful or unfair conduct with respect to their insureds, including plaintiffs. Concluding that the defendant insurers had done nothing that was not compelled by the relevant uninsured motorist provisions of the Insurance Code, the trial court sustained the demurrer to the third amended complaint without leave to amend.

After a careful review of the allegation of plaintiffs' complaint and the applicable law, we are persuaded that the trial court correctly sustained the demurrer *without* leave to amend as to certain of the insurer defendants, but as to others it should have been sustained *with* leave to amend. The defendant insurers are correct in their contentions with respect to those insurers marketing a single liability policy covering two or more vehicles. The relevant statute requires the very action about which plaintiffs complain. Thus, they can be liable under neither the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.)[3] nor the Cartwright Act. (Bus. & Prof. Code, § 16700 et seq.) However, as to those insurers marketing individual policies for each vehicle, a different conclusion is warranted. The trial court did not address the argument raised by some of the defendant insurers that plaintiffs were required, and failed, to exhaust their administrative remedies. That issue, and the related issue of the possible application of the primary jurisdiction doctrine, will have to be addressed upon remand. We therefore will affirm in part and reverse in part.

### FACTUAL AND PROCEDURAL BACKGROUND[4]

In their complaint, plaintiffs allege that, during the four years immediately preceding February 19, 1998 (the date plaintiffs filed their original complaint), the defendant insurers were responsible for providing approximately 80 percent of the automobile liability insurance sold in California. During that period, there were approximately 4,700,000 insured automobile owners who owned and operated two or more vehicles in the same household. Included in this group were plaintiffs, and others, who desired to purchase uninsured motorist coverage for only one, or at least less than all, of their multiple vehicles. The defendant insurers, however, required that plaintiffs and other insureds either purchase uninsured motorist coverage for *all* of their vehicles or have no uninsured motorist coverage on *any* vehicle.

---

[3]We shall refer to Business and Professions Code section 17200 et seq. as the unfair competition law (UCL) even though this is not a legislatively adopted name for these code sections. However, our Supreme Court refers to these sections in this same way. (See, e.g., *Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 263 [41 Cal.Rptr.2d 220, 895 P.2d 56].)

[4]Given that this matter comes before us on demurrer, the facts we recite are those alleged in plaintiffs' third amended complaint, which is the operative pleading before us.

According to plaintiffs' allegations, this "business position" was enforced by each and everyone of the defendant insurers, whether the insurer (1) sold *separate* policies for *each* one of an insured's multiple vehicles (this was the practice followed by State Farm, Farmers and Allstate) or (2) sold a *single* policy covering *all* of an insured's vehicles (this was the practice of all the remaining defendant insurers—see fn. 2, *ante*). Plaintiffs allege that the defendant insurers, and each of them, agreed together to enforce such an "all or nothing" policy in order to require insureds who owned multiple vehicles to purchase more uninsured motorist insurance than they needed or desired.[5] Plaintiffs allege that this unlawful agreement forced some insureds to pay more than they otherwise would have paid for necessary uninsured motorist coverage or, in the case of those who could not afford to purchase such coverage for all vehicles, to go without any uninsured motorist insurance.[6] The defendant insurers allegedly justified this business practice by stating that they were compelled by law to provide uninsured motorist coverage in this manner; since their marketing practice was compelled by the relevant statutes, there could be no violation of law or an unlawful conspiracy.

Insurance Code section 11580.2,[7] the code section that gives insureds a right to obtain uninsured motorist insurance, establishes very specific requirements concerning the manner in which such coverage is to be offered to

[5]Specifically, plaintiffs set forth (in par. 23 of their current pleading) the creation and existence of the alleged conspiracy in the following terms: "[T]he Insurer Defendants, and each of them, engaged together in a common scheme and civil conspiracy to unlawfully coerce certain consumers of automobile liability insurance, who owned more than one vehicle to be so insured, to purchase more [uninsured motorist] coverage than what the purchaser desired, by refusing to sell said purchaser any [uninsured motorist] coverage at all unless said coverage applied to all of said purchaser's insured vehicles."

[6]In their complaint, plaintiffs alleged that they were representatives of the class of insureds adversely impacted by this common and agreed-to business practice of the defendant insurers. To support their claim to the status of "representative" plaintiffs, the complaint alleges the following: (1) the plaintiff Smith, although desiring uninsured motorist coverage on only one of her vehicles, was required by State Farm, as a condition to the purchase of uninsured motorist coverage on the first vehicle, to pay for uninsured motorist coverage on her other two vehicles; (2) the plaintiff Armendariz, although desiring uninsured motorist coverage on only one of his vehicles, was required by Colonial Penn, as a condition for purchasing uninsured motorist coverage on the first vehicle, to pay for uninsured motorist coverage on his other vehicle as well; (3) the plaintiff Grace, although desiring uninsured motorist coverage on only three of her six vehicles, was required by the Auto Club, as a condition for purchasing uninsured motorist coverage for those three vehicles, to purchase uninsured motorist coverage on the other three; (4) the plaintiff Seiling, although desiring uninsured motorist coverage on only one of her vehicles, was required by defendant Farmers, as a condition for purchasing uninsured motorist coverage on the first vehicle, also to pay for uninsured motorist coverage on the second vehicle; and (5) the plaintiff Mossanen, although desiring uninsured motorist coverage on only two of her three vehicles, was required by defendant Mercury, as a condition for purchasing uninsured motorist coverage on those two vehicles, to pay for uninsured motorist coverage on the third as well.

[7]Unless otherwise indicated, all statutory references are to the Insurance Code.

automobile policyholders and the forms of coverage waiver that may be used. To ensure that uninsured motorist coverage is widely written, the Legislature requires that it be offered to *all* California policyholders. The mandatory offer provision is contained in the first sentence of section 11580.2, subdivision (a)(1), which states: "No policy of bodily injury liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle, . . . shall be issued or delivered in this state . . . unless the policy contains, or has added to it by endorsement, a provision with coverage limits at least equal to the limits specified in subdivision (m)[8] and in no case less than the financial responsibility requirements specified in Section 16056 of the Vehicle Code insuring the insured, the insured's heirs or legal representative for all sums within the limits which he, she, or they, as the case may be, shall be legally entitled to recover as damages for bodily injury or wrongful death from the owner or operator of an uninsured motor vehicle."

The next sentence of section 11580.2, subdivision (a)(1), identifies the *three* circumstances by which the coverage can be waived or modified through the agreement of the insurer and policyholder. It provides: "The insurer and any named insured, prior to or subsequent to the issuance or renewal of a policy, may, by agreement in writing, in the form specified in paragraph (2) or paragraph (3), (1) delete the provision covering damage caused by an uninsured motor vehicle completely, or (2) delete the coverage when a motor vehicle is operated by a natural person or persons designated by name, or (3) agree to provide the coverage in an amount less than that required by subdivision (m) but not less than the financial responsibility requirements specified in Section 16056 of the Vehicle Code."

Section 11580.2, subdivision (a), thus authorizes three—and only three —means by which uninsured motorist coverage can be entirely waived, deleted, or modified and *mandates* the specific language that is to be used in any written agreement providing for such waiver or modification. (§ 11580.2, subd. (a)(2), (3).)[9] In sum, the statute permits (1) deletion of *all* coverage *under the policy*; (2) deletion of coverage for specifically named

---

[8]Subdivision (m) of section 11580.2 provides that the insurer must offer uninsured motorist coverage with limits equal to the bodily injury liability coverage in the underlying policy.

[9]The agreement to delete uninsured motorist coverage for damage caused by an uninsured motor vehicle completely, or to delete uninsured motorist coverage when a motor vehicle is operated by a natural person or persons designated by name, must be in the following form:

" 'The California Insurance Code requires an insurer to provide uninsured motorists coverage in each bodily injury liability insurance policy it issues covering liability arising out of the ownership, maintenance, or use of a motor vehicle. Those provisions also permit the insurer and the applicant to delete the coverage completely or to delete the coverage when a motor vehicle is operated by a natural person or persons designated by name. Uninsured

individuals; and (3) an agreement to provide coverage in an amount less than the bodily injury liability limits in the underlying policy.

According to plaintiffs, since at least February 1994, the defendant insurers have participated in a civil conspiracy or combination to sell uninsured motorist insurance pursuant to an alleged "business policy" that decrees that any particular automobile owner seeking such insurance must purchase additional coverage at an additional price. Plaintiffs further allege that in some cases, this additional price is equal to approximately 80 percent of the initial policy price applied to each vehicle that the owner seeks to insure for liability coverage under the financial responsibility requirements of Vehicle Code section 16056.

Plaintiffs allege that additional uninsured motorist insurance covering more than one vehicle is both unnecessary and wasteful. Because of that, and because there can be no stacking of the insurance limits of multiple policies (see § 11580.2, subd. (d)), plaintiffs claim that they should have the right to purchase coverage on less than all of their vehicles. But, due to the aforesaid "business practice" of the defendant insurers, plaintiffs were coerced into purchasing coverage on *all* owned vehicles, under threat of otherwise having no uninsured motorist coverage at all.

Plaintiffs alleged that this "business practice" was an unfair business practice under the UCL (Bus. & Prof. Code, § 17200 et seq.), and resulted in class members being charged "coerced rates" for unwanted coverage. They

motorists coverage insures the insured, his or her heirs, or legal representatives for all sums within the limits established by law, which the person or persons are legally entitled to recover as damages for bodily injury, including any resulting sickness, disease, or death, to the insured *from the owner or operator of an uninsured motor vehicle not owned or operated by the insured or a resident of the same household.* An uninsured motor vehicle includes an underinsured motor vehicle as defined in subdivision (p) of Section 11580.2 of the Insurance Code.' " (§ 11580.2, subd. (a)(2), italics added.)

The agreement to provide uninsured motorist coverage in an amount less than that required by subdivision (m) of section 11580.2 must be in the following form:

" 'The California Insurance Code requires an insurer to provide uninsured motorists coverage in each bodily injury liability insurance policy it issues covering liability arising out of the ownership, maintenance, or use of a motor vehicle. Those provisions also permit the insurer and the applicant to agree to provide the coverage in an amount less than that required by subdivision (m) of Section 11580.2 of the Insurance Code but not less than the financial responsibility requirements. Uninsured motorists coverage insures the insured, his or her heirs, or legal representatives for all sums within the limits established by law, which the person or persons are legally entitled to recover as damages for bodily injury, including any resulting sickness, disease, or death, to the insured *from the owner or operator of an uninsured motor vehicle not owned or operated by the insured or a resident of the same household.* An uninsured motor vehicle includes an underinsured motor vehicle as defined in subdivision (p) of Section 11580.2 of the Insurance Code.' " (§ 11580.2, subd. (a)(3), italics added.)

also alleged that this "business practice" resulted in restraint of trade, price fixing, tying agreements and other illegal trade practices, all in violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), as well as provisions of the federal Clayton Act, all to the class's damage. The defendant insurers demurred to the complaint. Despite multiple opportunities to amend, plaintiffs were unable to allege facts sufficient to satisfy the trial court. It held that Insurance Code section 11580.2 *required* defendants to offer uninsured motorist coverage on an "all or nothing" basis to persons who owned multiple vehicles. Accordingly, the trial court concluded that the defendant insurers could not be liable for *agreeing* to do what the law *required* them to do in the first place. Their demurrer was sustained without leave to amend and a judgment of dismissal was entered.[10] Plaintiffs have prosecuted this timely appeal.

## CONTENTS

Plaintiffs argue that the trial court's conclusion that the Insurance Code *required* the defendant insurers to provide uninsured motorist coverage for all vehicles owned by an insured, or none of them, is wrong. They contend that nothing contained in the Insurance Code compels such a result. Plaintiffs also contend that the allegations of their third amended complaint sufficiently plead the existence of an unlawful conspiracy to violate the UCL (Bus. & Prof. Code, § 17200 et seq.) and the Cartwright Act. (Bus. & Prof. Code, § 16700 et seq.) The allegations, however general they may be, allege concerted action, undertaken by agreement, to require insured owners of multiple vehicles to purchase uninsured motorist coverage on all of their vehicles (or none of them) whether a single policy covering multiple vehicles is used or the insurer utilizes separate policies for each vehicle owned by the insured. Moreover, if insurers issuing a separate policy for each vehicle are free to agree to a waiver of uninsured motorist coverage as to any or all of the vehicles covered (as the defendant insurers apparently concede), the result should be no different just because an insurer chooses to cover an insured's multiple vehicles with a single policy.

The defendant insurers advance several arguments in support of the trial court's order of dismissal. First, and primarily, they contend that section

---

[10]In its order, the trial court stated: "The Court has determined that Insurance Code section 11580.2 does not authorize deletion of otherwise mandatory uninsured motorist coverage except in the manner set forth therein and deletion of uninsured motorist coverage 'by car' is not authorized by the statute. Plaintiffs have failed to adequately allege an unlawful conspiracy between and among the defendants either under the Cartwright Act or otherwise. Plaintiffs have been given three successive opportunities to amend and it now appears that they are unable to allege sufficiently the elements of a valid cause of action, hence the Demurrers are sustained without leave to further amend."

11580.2 *mandates* that uninsured motorist coverage be provided (in specified minimum amounts) in every "policy of bodily injury liability insurance" issued or delivered in California. There are three, and only three, circumstances in which such requirement may be waived or modified (one of which is a written agreement to waive *all* uninsured motorist coverage *under the policy*); the statute makes no provision for a right to waive such coverage on a "per vehicle" basis. Thus, in the case of a single policy covering multiple vehicles, uninsured motorist coverage must be purchased for all vehicles or waived as to all. With respect to those defendant insurers that issue separate policies for *each* vehicle owned by an insured (State Farm, Farmers and Allstate), they argue that they permit their insureds to waive uninsured motorist coverage for any of those policies. This contention, however, is contrary to the allegations of the complaint.[11] The defendant insurers also argue that plaintiffs have failed to allege sufficient specific facts of an unlawful conspiracy, but have only made inadequate general conclusionary allegations. Indeed, the defendant insurers argue that, given the general and conclusionary nature of plaintiffs' allegations, the most that they have alleged is parallel conduct by a number of automobile liability insurers. This, they contend, is not sufficient to demonstrate an actionable conspiracy to violate the antitrust laws. Finally, one of the defendant insurers (CSAA) argues that plaintiffs are making an objection to an "underwriting rule," an issue that is within the exclusive jurisdiction of the Insurance Commissioner[12] and plaintiffs have not alleged the exhaustion of that administrative remedy.

## DISCUSSION

### 1. *Standard of Review*

██ We review here an order of the trial court sustaining a demurrer without leave to amend. A demurrer tests the sufficiency of the allegations in a complaint as a matter of law. (*Pacifica Homeowners' Assn. v. Wesley Palms Retirement Community* (1986) 178 Cal.App.3d 1147, 1151 [224 Cal.Rptr. 380].) We review the sufficiency of the challenged complaint de novo.

---

[11]There was an effort to provide evidence of such fact by a request to the trial court to take judicial notice of the contents of the actual policies issued to some of the representative plaintiffs. However, plaintiffs objected and such request was denied. The written requests for such judicial notice are in the appellate record and defendants argue that the trial court should have considered them. We believe, however, that the trial court was correct in limiting its ruling on the demurrer to the allegations of plaintiffs' third amended complaint. The contents of actual policies issued to the representative plaintiffs may certainly be considered in connection with any motions for summary adjudication or judgment that may be brought following remand.

[12]This argument is joined in by defendant insurers Auto Club, Farmers, Safeco and USAA.

(*Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 529 [260 Cal.Rptr. 713].) We accept as true the properly pleaded allegations of fact in the complaint, but not the contentions, deductions or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We also accept as true facts which may be inferred from those expressly alleged. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].) We consider matters which may be judicially noticed, and we "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318.) We do not concern ourselves with whether the plaintiff will be able to prove the facts that he or she may allege in the complaint. (*Parsons v. Tickner* (1995) 31 Cal.App.4th 1513, 1521 [37 Cal.Rptr.2d 810].)

The judgment or order of dismissal must be affirmed if any one of the grounds for demurrer raised by the defendant is well taken and disposes of the complaint. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) It is error, however, to sustain a general demurrer if the complaint states a cause of action under any possible legal theory. (*Ibid.*) Further, it is an abuse of the trial court's discretion to sustain a demurrer without leave to amend if there is a reasonable possibility the plaintiff can amend the complaint to allege any cause of action. (*Ibid.*) To prove such abuse of discretion, however, the plaintiff must demonstrate how the complaint can be amended. (*Ibid.*) While such a showing can be made for the first time to the reviewing court (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1386 [272 Cal.Rptr. 387]), it must be made. As the trial court noted, plaintiffs have had four opportunities to allege viable causes of action against the insurer defendants.

2. *The Relevant Law Applicable to the Purchase and Waiver of Uninsured Motorist Coverage*

a. *Uninsured Motorist Coverage Provided in a Single Policy Covering Multiple Vehicles May Not Be Waived on a "Per Vehicle" Basis*

Section 11580.2, subdivision (a) is very clear and unambiguous: "*No policy* of bodily injury liability insurance covering liability arising out of the ownership, maintenance, or use of *any* motor vehicle, . . . *shall be issued or delivered* in this state . . . *unless the policy contains*, . . . a *provision* [for specified limits of uninsured motorist coverage] . . . ." (Italics added.)

The Legislature enacted section 11580.2 in 1959[13] in an attempt to "minimize losses to the people of California who are involved in accidents with uninsured or financially irresponsible motorists, . . ." (*Mission Ins. Co. v. Brown* (1965) 63 Cal.2d 508, 510 [47 Cal.Rptr. 363, 407 P.2d 275].) The committee that drafted section 11580.2 and recommended its passage determined that increasing the number of motorists with uninsured motorist coverage "will inevitably lessen personal losses resulting from accidents involving uninsured motorists." (Assem. Com. on Judiciary, Traffic Accident Consequences Subcom., Final Rep. (Apr. 1959) p. 15.) It also found that many motorists did not realize that most auto insurance policies at that time did not contain such coverage. (*Ibid.*) Many other motorists were not even aware that such coverage was available. (*Ibid.*) The Legislature therefore purposefully made the decision to require uninsured motorist coverage to be *included* in *every policy* of automobile liability insurance issued or delivered in California. (§ 11580.2, subd. (a).)

From the outset, it was clear that this coverage was required for every policy. However, it was not deemed to be compulsory; the insurer and insured were permitted to delete the provision entirely. The original legislation provided that "the insurer and the insured may by supplemental agreement waive application of the provision covering damage caused by an uninsured motor vehicle." (§ 11580.2, as originally enacted by Stats. 1961, ch. 1189, § 2, p. 2921.) This was the *only* way that the coverage could be deleted. By subsequent enactments, the Legislature ultimately added two new subparagraphs to subdivision (a) of section 11580.2, which provided that not only did such supplemental agreement have to be in writing, but it had to be in a particular form (§ 11580.2, subd. (a)(1)-(3).) In addition, in 1971 and 1972, the Legislature added provisions that permitted (1) the deletion of coverage when the vehicle was being operated by a named natural person, and (2) the reduction in the amount of coverage (but not to an amount less than the financial responsibility minimum specified in Vehicle Code section 16056). (Stats. 1971, ch. 1564, § 4, p. 3137, eff. Nov. 17, 1971; Stats. 1972, ch. 952, § 1, p. 1722.)

■ The basic and first rule that guides our interpretation and construction of a statute is well established. "The fundamental task of statutory construction is to 'ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, *we begin by examining the language of the statute*.' [Citation.]" (*People v. Cruz* (1996)

---

[13]Section 11580.2 as passed in 1959 was repealed and reenacted in 1961 with certain modifications not pertinent here.

13 Cal.4th 764, 774-775 [55 Cal.Rptr.2d 117, 919 P.2d 731], italics added.) When the statutory language *is plain and clear and unambiguously expresses the Legislative intent* and the single meaning of the language is apparent on its face, *we must give it effect. (Kimmel v. Goland* (1990) 51 Cal.3d 202, 208 [271 Cal.Rptr. 191, 793 P.2d 524]; *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1162 [68 Cal.Rptr.2d 440].) ▮▮▮ Plaintiffs, in asking us to judicially recognize an insured's right to delete one or more (but less than all) vehicles from a policy's uninsured motorist coverage, seek to have us read into this statute something that simply is not there. This we cannot do. "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (Code Civ. Proc., § 1858.)

From the statutory language adopted by the Legislature and this legislative history, we conclude that there was and is a strong and clearly expressed legislative mandate that uninsured motorist coverage be included in *every* policy and that it may *only* be deleted or modified in very specific and limited ways. There is no provision for deleting the coverage on a "per vehicle" basis so as to allow insured owners of multiple vehicles covered under a *single* liability policy to delete uninsured motorist coverage as to one or more (but less than all) of said vehicles. The plain language of the statute makes it clear that it must be applied to the *entire policy* and this necessarily includes *all* of the vehicles insured thereunder. In such circumstances, if an insured desires to have multiple vehicles covered by liability insurance provided in a *single* policy, then each such vehicle must also carry uninsured motorist coverage modifiable only as expressly authorized by the statute. Such a construction of the statute is necessary in order to give effect to what we perceive as the clearly expressed legislative intent.

Plaintiffs argue, however, that such a legislative analysis and conclusion ignores the language of another part of section 11580.2. They rely on subdivision (c)(6), which provides that uninsured motorist coverage (otherwise available under the insured's liability policy) "does not apply" to "bodily injury of *the* insured while occupying a motor vehicle owned by *an* insured or leased to *an* insured . . . unless the occupied vehicle is an *insured* motor vehicle . . . ." (Italics added.) Plaintiffs seem to be arguing that by its enactment of subdivision (c)(6) in 1968, the Legislature effectively recognized a "per vehicle" deletion of uninsured motorist coverage. Otherwise, they argue, the statutory language would make no sense. We disagree.

Subdivision (c)(6) of section 11580.2 also appears to be clear and straightforward. It precludes the insured from claiming the benefits of uninsured

motorist coverage if he or she suffers a bodily injury arising from the negligence of an uninsured motorist while the insured is occupying an *uninsured* motor vehicle owned by a person who is *an* insured under the insured's liability policy. For example, *the* insured's son is a resident in the insured's household and is therefore *an* insured under the insured's policy; but if he happens to own his own motor vehicle, which is not covered by a policy of liability insurance, then the insured's own uninsured motorist coverage will not apply if the insured is injured while riding with his son and there is an accident resulting from the negligence of some uninsured motorist.[14] In such event, neither *the* insured father nor his son, although *an* insured under the insured father's policy, could recover the uninsured motorist benefits that otherwise might have been payable under the father's policy had the son's car been an "insured motor vehicle." (See *Interinsurance Exchange v. Velji* (1975) 44 Cal.App.3d 310, 315 [118 Cal.Rptr. 596] [§ 11580.2, subd. (c)(6) " 'prevents the coverage of one policy from extending to accidents involving other owned but uninsured vehicles, and reflects the theory that each motor vehicle should carry its own liability insurance and uninsured motorist coverage.' [Citation.]"].)

In *Hartford Casualty Ins. Co. v. Cancilla* (1994) 28 Cal.App.4th 1305 [34 Cal.Rptr.2d 302], the insured was riding his motorcycle when he was struck and killed by an uninsured motorist. The insurance policy for his motorcycle included uninsured motorist coverage for only $15,000 per insured, but he also had a policy covering a van, which provided such coverage in the amount of $1 million. When the insurer refused to tender $1 million to the policyholder's surviving spouse, she brought suit. The court held that the wife was limited to receiving the limits for the uninsured motorist coverage on the motorcycle. As the court put it, the wife's argument "strains credulity when one considers the specific problem . . . subdivision (c)(6) was meant to resolve, the purpose of the statute and the language of the statute read as a whole. [The wife] argues that section 11580.2 simply insures people, not vehicles. She is only half right. The section allows only certain people to claim uninsured motorist coverage—*those whose uninsured motorist insurance covers the vehicle they are driving at the time of an accident with an uninsured motorist.*" (*Id.,* at pp. 1311-1312, italics added; see also *Harrison*

---

[14]For sake of clarity, it should be noted that an "uninsured motor vehicle" for purposes of determining uninsured motorist coverage does not include any motor vehicle owned or operated by the named insured or any resident of the same household. (§ 11580.2, subd. (b)(2).) Thus, the negligent uninsured motorist in the above described example necessarily refers to some *third party* motorist whose negligence resulted in an accident involving the son's vehicle.

*v. California State Auto Assn. Inter-Ins.-Bureau* (1976) 56 Cal.App.3d 657, 662-663 [128 Cal.Rptr. 514].)[15]

We find no support whatever in the language of section 11580.2, subdivision (c)(6) for plaintiffs' argument. It reflects, in our view, no intent or purpose of the Legislature to recognize a new or an additional means or manner of waiving uninsured motorist coverage. It was enacted for an entirely different purpose. As one court put it, the subdivision "was added to rectify a specific problem—attempts by those who do not maintain insurance to use another's coverage to make a claim. It was intended to make sure people carry their own insurance for their own claims." (*Hartford Casualty Ins. Co. v. Cancilla, supra,* 28 Cal.App.4th at p. 1313.) The language of subdivision (c)(6) adds nothing to the argument before us; it has nothing to do with a legislative attempt to amend the waivers provision of subdivision (a)(1) of section 11580.2. As our previous discussion demonstrates, when the Legislature wanted to amend those provisions so as to prescribe the limited bases for the waiver of uninsured motorist coverage, it knew precisely how to do it and did so explicitly.

While it is true that we should construe liberally the uninsured motorist statutory provisions, a liberal interpretation does not mean enlarging the plain provisions of law. As we have already emphasized, the function of judicial interpretation is to declare what is contained in a statute, not to insert what has been omitted. (Code Civ. Proc., § 1858; *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].) Here, the Legislature specifically provided for waivers by policy and by person, but not by vehicle. We may not now provide what the Legislature has not.

---

[15]The court in *Cancilla* also observed that section 11580.2, subdivision (b), was amended in 1989 to include the language that appears to limit the definition to subdivision (b) ("As used in this *subdivision, 'insured motor vehicle' means . . . .*") (§ 11580.2, subd. (b), italics added.) However, case law prior to 1989 expressly held that subdivision (b) applied to subdivision (c)(6). (*Hartford Casualty Ins. Co. v. Cancilla, supra,* 28 Cal.App.4th at p. 1313.) The court then held that subdivision (b) "is a compendium of definitions of terms used in the statute and no substantive change was intended by the amendment." (*Cancilla, supra,* 28 Cal.App.4th at p. 1313.) The Legislative Counsel's Digest noted that, " 'This bill would restate existing provisions of law . . . and *would not make any substantive change in the law.*' " (*Ibid.,* italics omitted.) The 1989 amendment, in other words, amounted to nothing more than "routine code maintenance" and therefore could not be held to alter the prior law. (*Ibid.*) Thus, the language of the statute makes clear that uninsured motorist coverage applies only to the vehicle(s) listed in the policy.

### b. *Insureds Purchasing Separate Policies for Each of Multiple Vehicles May Waive Uninsured Motorist Coverage for Any or All of Said Vehicles by Waiving Such Coverage as to One or More of Said Policies*

From the above discussion, it is clear that a waiver of uninsured motorist coverage must be as to all vehicles *covered under a single policy*. In other words, the waiver is as to the coverage provided *by the policy;* it may not be accomplished as to some but less than all of the covered vehicles. Where, however, an insured purchases a separate policy for each of several vehicles, that same principle would obviously permit the insured to waive uninsured motorist coverage as to one, all or less than all of those vehicles. The defendant insurers do not quarrel with this. As we have pointed out, three of the defendant insurers (State Farm, Farmers and Allstate), in fact, sell separate individual policies for each vehicle owned by an insured.[16]

As to such separate policies, the Insurance Code not only does not preclude waiver on a "per car" basis, but it necessarily authorizes it. To the extent that any of the defendant insurers have wrongfully refused to permit their insureds whose multiple vehicles are covered by separate policies to waive uninsured motorist coverage except upon an "all or none" basis, as is alleged in plaintiffs' complaint, they cannot justify their action by reliance on the Insurance Code.[17]

### c. *An Insurer May Not Be Required to Issue Separate Policies to an Insured Seeking Coverage for Multiple Vehicles*

As this record reflects, some of the defendant insurers follow the practice of issuing a single policy that covers all of the vehicles an insured desires to insure. Others are willing to sell separate policies covering *each* vehicle owned by an insured. In our view, this is simply a business or marketing decision best left to the judgment of each insurer. (See, e.g., *Barnes v. State Farm Mut. Auto. Ins. Co.* (1993) 16 Cal.App.4th 365, 378 [20 Cal.Rptr.2d 87].) Similarly, an insured desiring to have a separate policy for each one of

---

[16]These insurers argue in their briefs that the individual policies actually sold to certain of the representative plaintiffs were subject to the waiver allowed under section 11580.2, subdivision (a)(1) and, where requested, such waivers were accomplished. However, the formal evidence supporting such claims is not before us. It is included in requests for judicial Notice that were not considered by the trial court in light of the fact that the attack on plaintiffs' complaint was by demurrer.

[17]It is true that section 11580.2, subdivision (a)(1), requires that any waiver of uninsured motorist coverage be accomplished by an *"agreement* in writing." The defendant insurers, however, make no contention that they have any bargaining rights in the matter or that a liability insurer is entitled to withhold its "agreement" to an insured's request for such a waiver.

his or her multiple vehicles (and thus the ability to waive uninsured motorist coverage on some, but less than all of said multiple vehicles) can chose to do business with an insurer which follows such practice.

There is nothing in the Insurance Code which specifies or requires an insurer to adopt either marketing policy. It is simply silent on the issue. In addition, it is clear that the Legislature has been long aware that single liability policies are commonly marketed to owners of multiple vehicles.[18] This is confirmed by the legislative history of section 11580.2. Under the original form of automobile insurance sold in California, all vehicles in a household were insured on a single policy for a premium which did not depend on the number of vehicles insured. When insurers begin basing the premium charged on the number of vehicles insured—so that coverage was only provided on vehicles for which a premium had been paid—the Legislature did *not* mandate that each vehicle be insured under a separate policy. In 1959, when the Legislature first required that insurers offer uninsured motorist coverage, by enacting section 11580.2, it did not include any provision requiring that all vehicles be insured on separate policies in that section. Nor has it since ever elected to do so. We will not now impose such a burden by judicial fiat.

### 3. *Insurer Is Not Liable Under UCL for Engaging in Conduct Mandated or Authorized by Insurance Code.*

The UCL (Bus. & Prof. Code, § 17200) provides that any "unlawful," "unfair" or "fraudulent" business act or practice is deemed to be unfair competition. (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1102 [53 Cal.Rptr.2d 229] (*State Farm*).) Injunctive relief and/or restitution is the remedy authorized. (Bus. & Prof. Code, § 17203.)[19] An "unlawful" business activity includes " '*anything* that can properly be

---

[18]For example, in 1968, in section 660, subdivision (a) (relating to cancellation of or failure to renew, an automobile insurance policy), the Legislature defined a "policy" as an "automobile liability, automobile physical damage, or automobile collision policy, or any combination thereof, delivered or issued for delivery in this state, insuring a single individual or individuals residing in the same household, as named insured, and under which the *insured vehicles* therein designated are of the following types only: [list of vehicle types omitted]" (Italics added.)

[19]Business and Professions Code section 17203 provides: "Any person *who engages, has engaged, or proposes to engage in unfair competition may be enjoined* in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or *as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.*" (Italics added.)

called a business practice and that at the same time is forbidden by law.' [Citation.]" (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817], italics added.) Virtually any law— federal, state or local—can serve as a predicate for an action under Business and Professions Code section 17200. (*State Farm, supra,* 45 Cal.App.4th at pp. 1102-1103.) Thus, it is fairly said that section 17200 "borrows" violations of other laws and treats them as "unlawful" practices independently actionable under the unfair competition law. (*State Farm, supra,* at p. 1103.)

Clearly, and as we have exhaustively demonstrated, the defendant insurers selling multiple vehicle policies have not, by their actions, violated the provisions of section Insurance Code 11580.2. Indeed, as we have said, their refusal to recognize the piecemeal "by vehicle" waivers of uninsured motorist coverage in multiple vehicle policies is *mandated* by that statute. Thus, allegations that they have engaged in such conduct does not reflect an "unlawful business activity" and is therefore not actionable on that ground under Business and Professions Code section 17200.

On the other hand, some defendant insurers selling separate policies for each vehicle are *alleged* to have adopted the same business practice and to have refused to recognize any waiver that did not apply to *all* of an insured's vehicles. These defendants cannot rely on the same argument.[20] Such a business practice is *not* required by section 11508.2; nor is it proscribed. Thus, such a practice could not be said to constitute an "*unlawful* business activity" (unless, of course, it were to constitute a violation of the Cartwright Act, discussed below). But it may well constitute an "*unfair*" business practice, which is also condemned by the UCL.

It is not necessary for a business practice to be "unlawful" in order to be subject to an action under the unfair competition law. "The 'unfair' standard, the second prong of [Business and Professions Code] section 17200, also provides an independent basis for relief. This standard is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. [Citation.] The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . [Citations.]' [Citation.] In *People* v. *Casa Blanca Convalescent Homes, Inc.*

---

[20]We emphasize the word "alleged" here because of the troubling presence in the record of material (which, on review of a demurrer, we do not consider) that strongly suggests this claim against State Farm, Farmers and Allstate is simply not true and cannot be proven because the actual practice of those insurers is just the opposite. This, of course, is a matter that must be addressed in different proceedings following remand.

(1984) 159 Cal.App.3d 509 [206 Cal.Rptr. 164, 53 A.L.R.4th 661], the court, acknowledging that the parameters of the term 'unfair business practice' had not been defined in a California case, applied guidelines adopted by the Federal Trade Commission and sanctioned by the United States Supreme Court in *FTC* v. *Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 244 [31 L.Ed.2d 170, 179, 92 S.Ct. 898].[21] The court concluded that an 'unfair' business practice occurs when that practice 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' [Citation.]" (*State Farm, supra,* 45 Cal.App.4th at pp. 1103-1104.)

"Examples of unfair business practices include: charging a higher than normal rate for copies of deposition transcripts (by a group of certified shorthand reporters), where the party receiving the original is being given an undisclosed discount as the result of an exclusive volume-discount contract with two insurance companies [citation]; placing unlawful or unenforceable terms in form contracts [citation]; asserting a contractual right one does not have [citations]; systematically breaching a form contract affecting many consumers [citation], or many producers [citation]; and imposing contract terms that make the debtor pay the collection costs [citation]." (*State Farm, supra,* 45 Cal.App.4th at p. 1104.)

Without a doubt the concept of proscribing such a range of conduct by the term "unfair" business activity is very broad in its scope;[22] however, it is not unlimited. "Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to

---

[21]"In *Sperry*, the Supreme Court said: 'The [Federal Trade] Commission has described the factors it considers in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is nonetheless unfair: [¶] "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." ' (*FTC v. Sperry & Hutchinson Co., supra,* 405 U.S. at pp. 244-245, fn. 5 [31 L.Ed.2d at p. 179].)" (*State Farm, supra,* 45 Cal.App.4th at p. 1104, fn. 6.)

[22]As one court put it a number of years ago, " '[T]he Legislature . . . intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, . . . the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable ' "new schemes which the fertility of man's invention would contrive." ' [Citation.] . . . [¶] . . . [G]iven the creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would not be adequate." (*Barquis v. Merchants Collection Assn., supra,* 7 Cal.3d at pp. 111-112, fn. omitted.) "[I]t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited [citations], since unfair or fraudulent business practices may run the gamut of

declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When [for example] specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor. [¶] . . . [¶] A plaintiff may thus not 'plead around' an 'absolute bar to relief' simply 'by recasting the cause of action as one for unfair competition.' [Citation.] The rule does not, however, prohibit an action under the unfair competition law merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct. There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful. For example, Penal Code section 211, which defines robbery, does not make murder unlawful. Most assuredly, however, that section does not also make murder lawful. *Acts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law, but acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in someother provision.*" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182-183 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*), italics added.)[23]

---

human ingenuity and chicanery." (*People ex rel. Mosk v. National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 772 [20 Cal.Rptr. 516].)

[23]It is true that *Cel-Tech* was critical of the broad characterizations of the "unfair" prong of Business and Professions Code section 17200, as summarized in appellate cases such as our earlier decision in *State Farm.* The *Cel-Tech* court described such definitions as "too amorphous [in that they] provide too little guidance to courts and business." (*Cel-Tech, supra,* 20 Cal.4th at p. 185.) The court made such comment, however, in the context of a dispute between *competitors.* Indeed, the *Cel-Tech* court concluded by articulating a specific and restrictive definition of "unfair" that was to be applied whenever a plaintiff claimed to have suffered injury "*from a direct competitor's* 'unfair' act or practice [and the plaintiff has invoked] section 17200 . . . ." (*Id.* at p. 187, italics added.) The court stated that "the word 'unfair' [in section 17200] means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Ibid.*)

As the court itself acknowledged, we are not to read *Cel-Tech* as suggesting that such a restrictive definition of "unfair" should be applied in the case of an alleged *consumer* injury. The court stated, "[t]his case involves an action by a competitor alleging anticompetitive practices. *Our discussion and this test are limited to that context.* Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as 'fraudulent' or 'unlawful' business practices or 'unfair, deceptive, untrue or misleading advertising.' We also express no view on the application of federal cases such as *FTC v. Sperry & Hutchinson Co.*[, *supra,*] 405 U.S. 233 . . . that involve injury to consumers and therefore do not relate to actions like this one." (*Cal-Tech, supra,* 20 Cal.4th p. 187, fn. 12.) It would thus appear that the *Cel-Tech* court's comments did not signal a

Thus, to the extent that those defendant insurers that had issued single multiple vehicle policies refused to recognize any waiver of uninsured motorist coverage that did not apply to all of the insured's vehicles, no cause of action can be stated under the UCL. Given our construction and interpretation of section 11580.2, there was neither anything unlawful or unfair about such a business practice. Indeed, the insurers had no alternative under the law.

The same conclusion does not apply, however, to those insurers that issued separate policies for each of an insured's multiple vehicles, but nonetheless refused to permit any waiver that did not include all of the insured's vehicles. Such conduct is at least generally alleged by plaintiffs and, it is also alleged, was done for the purpose of requiring insureds to purchase more uninsured motorist coverage than was needed, all to the alleged increased premium benefit of the defendant insurers and to the injury and damage of insureds who were faced with the choice of paying wasteful increased premiums or going without *any* uninsured motorist coverage.[24] We have no trouble concluding, given our review of the authorities discussed above, that such conduct, if proven, would constitute an unfair business practice actionable under the UCL. (Bus. & Prof. Code, § 17200.)[25]

4. *Plaintiffs Have Failed to Allege Adequately a Conspiracy to Violate the Cartwright Act*

Business and Professions Code section 16720, a part of the Cartwright Act, includes the following among the acts it defines as a prohibited "trust": " '[A]cts by two or more persons . . . : [¶] (a) To create or carry out restrictions in trade or commerce.' Insurance is 'commerce' within the meaning of this section. [Citation.] While refusing to sell a product to a consumer does not itself violate the Cartwright Act, when that refusal is the result of a combination, agreement, or conspiracy to make that product

retreat (at least in noncompetitor cases), from its earlier statements in *Barquis v. Merchants Collection Assn., supra,* 7 Cal.3d at pages 111-112. (See fn. 22, *ante.*)

[24]Given the increased risk of uninsured motorist liability posed by an insured's use of multiple vehicles, it is not at all clear to us just how "wasteful" it is to require such coverage on all otherwise insured vehicles. Plaintiffs indicated at oral argument, however, that to require them to cover more than one vehicle with uninsured motorist coverage would give them no greater protection for bodily injury sustained while either a pedestrian or a passenger in a nonowned vehicle.

[25]The defendant insurers point out that plaintiffs failed to comply with the requirements of Business and Professions Code section 17209 (requiring them to serve a copy of their brief on the Attorney General of California and the District Attorney of Los Angeles County). As they receive no judgment or relief (under Bus. & Prof. Code, § 17200) in this opinion and the matter will be remanded for further proceedings, we need not discuss the issue further.

unavailable in a given market a prohibited restraint of trade may be found. [Citation.]" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 48-49 [77 Cal.Rptr.2d 709, 960 P.2d 513] (*Quelimane Co.*).)[26]

An agreement among merchants is prohibited by Business and Professions Code section 16720 only if restraint of trade in the commodity is the purpose of the agreement. (*Quelimane Co., supra,* 19 Cal.4th at p. 49.) "A cause of action for restraint of trade under the Cartwright Act or common law principles must allege both a purpose to restrain trade and injury to the business of the plaintiff traceable to actions in furtherance of that purpose. [Citations.]" (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 119 [81 Cal.Rptr. 592, 460 P.2d 464].)

"A cause of action for a conspiracy in restraint of trade ' "must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. [Citations.]" [Citation.] General allegations of agreement have been held sufficient [citation], and the conspiracy averment has even been held unnecessary, providing the unlawful acts or civil wrongs are otherwise sufficiently alleged.' [Citations.]" (*Quelimane Co., supra,* 19 Cal.4th at pp. 47-48.) General allegations of agreement have been upheld, and allegations of conspiracy have been held to be unnecessary, *"providing the unlawful acts or civil wrongs are otherwise sufficiently alleged."* (*Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 316 [70 Cal.Rptr.2d 849, 444 P.2d 481].) It appears settled, however, that "a plaintiff cannot merely restate the elements of a Cartwright Act violation. Rather, in order to sufficiently state a cause of action, the plaintiff must allege in its complaint *certain facts* in addition to the elements of the alleged unlawful act so that the defendant can understand the nature of the alleged wrong and discovery is not merely a blind 'fishing expedition' for some unknown wrongful acts. [Citation.]" (*Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224, 1236 [18 Cal.Rptr.2d 308], italics added.)

■ While the unilateral action of one or more insurers with respect to the terms upon which they will sell automobile policies would not offend the antitrust laws (although it might still be actionable as a violation of the UCL), when it is alleged that two or more insurers have entered into an agreement to act in concert to impose a business policy that is *not* mandated

---

[26]The Cartwright Act refers to a "combination of capital, skill or acts by two or more persons" for an unlawful purpose. (Bus. & Prof. Code, § 16720.) This connotes an agreement. A civil conspiracy requires an agreement, express or implied. (See *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 784 [157 Cal.Rptr. 392, 598 P.2d 45].)

by the Insurance Code and has the purpose and effect of depriving insureds of the ability to purchase individual policies for each one of multiple vehicles owned (i.e., the ability to waive—and thus avoid premiums for—unwanted uninsured motorist coverage for some but less than all of their vehicles), then a violation of the Cartwright Act would have been alleged. Such alleged concerted action, which has the effect of limiting the market place options of insureds, increasing their premium costs or, alternatively, forcing them to forgo all uninsured motorist coverage (a result which is itself contrary to California public policy), would sufficiently allege an unlawful combination which has as its purpose the restraint of trade. We do not believe, however, that plaintiffs' third amended complaint sufficiently pleads facts which meet these requirements.

The only allegation that we can find in plaintiffs' complaint that even purports to provide the required "certain facts" needed to enable the defendant insurers to understand the nature of their alleged wrongful act is found in paragraph 23: "the insurer defendants, and each of them, engaged together in a common scheme and civil conspiracy to unlawfully coerce certain consumers of automobile liability insurance, who owned more than one vehicle to be so insured to purchase more [uninsured motorist] coverage than what the purchaser desired, by refusing to sell said purchaser any [uninsured motorist] coverage at all unless said coverage applied to all of said purchaser's insured vehicles."

This is a very conclusionary allegation and provides no factual information to the defendant insurers. As we have pointed out, most of the defendant insurers were compelled by law (i.e., § 11580.2, subd. (a)) to do the very act about which plaintiffs complain. Thus, their conduct could not be described as unlawful. Whether or not they acted in concert with other insurers, *they could not lawfully do otherwise*. As to these insurers, the most plaintiffs have alleged is parallel action in accordance with a clear statutory mandate. Therefore, their conduct could not, *as a matter of law*, constitute a violation of the Cartwright Act. Given the conclusions we have reached as to the lawfulness of their actions, the general allegations of the complaint simply state no claim against these insurers. (See generally *Cellular Plus, Inc. v. Superior Court, supra,* 14 Cal.App.4th at p. 1236.) In the absence of more particular allegations, we decline to engage in any speculation as to just what wrongful acts or unlawful purposes may have occurred or been present so as to justify the conclusion that a Cartwright Act violation was committed. As plaintiffs have not been able to state a viable claim for violation of the Cartwright Act as to all but three of the defendant insurers, the trial court properly sustained their demurrer without leave to amend.

As to those defendant insurers that issued separate policies covering each one of an insured's multiple vehicles, they stand in a different position as they cannot rely on the same statutory mandate. Nonetheless, we are similarly concerned with the generality of plaintiffs' allegations. We have a concern that plaintiffs cannot truthfully allege that these insurers ever refused a separate request or demand to waive uninsured motorist coverage as to a particular policy. For example, there are no allegations that any of the plaintiffs ever demanded that a particular insurer do so. All we have are allegations of what amounts to parallel conduct accompanied by the general and conclusionary allegation that it was done pursuant to a "common scheme and civil conspiracy." But there are no allegations that plaintiffs requested that their policies be modified as permitted by the statute or that the insurers in spite of such requests refused to allow the plaintiffs to effect a waiver as to some, but less than all, of their separate vehicle policies. In addition, the insurers' "unlawful" economic motive or purpose is not apparent from the plaintiffs' general allegations. The insurer is obviously exposed to greater risk as to each vehicle insured. Thus, a premium charged for uninsured motorist coverage for a particular vehicle provides a separate additional benefit to the insured and a separate additional risk for the insurer. Coverage for insured vehicle A will not protect the insured if he or she is driving uninsured vehicle B when he or she is injured by an uninsured motorist. Under what circumstances would an insured, owning multiple vehicles, but insuring each with a separate policy, be paying for "unneeded" uninsured motorist coverage? If relevant facts demonstrating the existence of such "unneeded" or "wrongful" coverage can be truthfully alleged, then plaintiffs should be given the opportunity to do so. Given the otherwise apparently lawful nature of the insurers' actions, however, more specific allegations are required.

These are all matters that need to be clearly alleged so that those defendant insurers selling individual policies will know precisely what unlawful acts they are charged with having committed and just what facts and circumstances exist that justify application of the Cartwright Act. As to those defendant insurers selling separate policies, the demurrer may have been properly sustained, but it should have been sustained *with* leave to amend. We acknowledge that plaintiffs already have had four opportunities to plead their claim, but the trial court sustained the demurrer of the insurer defendants on a basis that actually applies only to some of them; it apparently did not consider the different legal position of those insurer defendants issuing separate policies. Now that we have clarified and isolated this issue, we believe it is appropriate that plaintiffs be given one more opportunity to see if they can plead a Cartwright Act violation as to those particular insurer

defendants whose specific business practice of issuing separate policies for each of an insured's multiple vehicles was not reflected in the trial court's order.

### 5. *The Need to Exhaust Administrative Remedies Before the Insurance Commissioner*

The final argument asserted by some of the defendant insurers (see fn. 12, *ante*) is that the alleged "business practice" of the defendant insurers with respect to the "all or nothing" waiver of uninsured motorist coverage constituted an "underwriting rule" and thus came within the exclusive jurisdiction of the Insurance Commissioner. (See § 1858.)[27] This means that plaintiffs had an administrative remedy that they were required to exhaust and that they failed to do so. That trial court did not reach the issue, however, as it sustained the defendant insurers' demurrer on the other ground that we have already discussed. Plaintiffs did not address this argument in their briefs. Therefore, we will not reach the issue either as we believe it should

---

[27]Section 1858 provides:

"(a) Any person aggrieved by *any rate charged, rating plan, rating system, or underwriting rule followed or adopted by an insurer or rating organization,* may file a written complaint with the commissioner requesting that the commissioner review the manner in which the rate, plan, system, or rule has been applied with respect to the insurance afforded to that person. In addition, the aggrieved person may file a written request for a public hearing before the commissioner, specifying the grounds relied upon.

"(b) The commissioner shall advise the insurer or rating organization that a complaint has been filed against it and the nature of the complaint and provide the insurer or rating organization with an opportunity to respond to the complaint.

"(c) If the commissioner has information concerning a similar complaint, he or she may deny the request for a public hearing until a determination is made or a public hearing is held on the similar complaint or may consolidate similar complaints for determination or public hearing. If he or she believes, after review and investigation of the facts alleged in the complaint and the facts alleged in any response to the complaint, that probable cause for the complaint does not exist or that the complaint is not made in good faith, he or she shall so advise the complainant and shall deny any request made for a public hearing. If he or she believes, after review and investigation of the facts alleged in the complaint and the facts alleged in any response to the complaint, that probable cause for the complaint does exist, that the complaint charges a violation of this chapter, and that the complainant would be aggrieved if the violation is proven, he or she shall proceed as provided in Section 1858.1 unless the complaint was accompanied by a request for public hearing, in which case he or she shall proceed as provided in Section 1858.2.

"(d) Nothing in this section prohibits or limits the right of any aggrieved person, either prior to or in conjunction with the filing of a written complaint with the commissioner under this section, from requesting an insurer or rating organization to review the manner in which the rate, plan, system, or rule has been applied with respect to the insurance afforded to that person." (Italics added.)

be addressed by the trial court in the first instance. For the assistance of the trial court, however, we will discuss some of the relevant principles.[28]

Critical to the argument of the defendant insurers is the proposition that the refusal to provide insurance except on an all or nothing at all basis is an underwriting rule. ■ "Underwriting" is a label commonly applied to the process, fundamental to the concept of insurance, of deciding which risks to insure and which to reject in order to spread losses over risks in an economically feasible way. (*Group Life & Health Ins. Co. v. Royal Drug Co.* (1979) 440 U.S. 205, 211-213 [99 S.Ct. 1067, 1073-1074, 59 L.Ed.2d 261]; *Wilson v. Fair Employment & Housing Com.* (1996) 46 Cal.App.4th 1213, 1226 [54 Cal.Rptr.2d 419] (dis. opn. of Bamattre-Manoukian, J.); cf. also 1 Couch, Insurance (3d ed. 1995) § 1.9, p. 1-16.) Given such understanding and the provisions of section 1858, subdivision (a) (see fn. 27, *ante*), it seems to us that an underwriting rule is properly characterized as a rule followed or adopted by an insurer or a rating organization which either (1) *limits* the conditions under which a policy will be issued or (2) *impacts* the rates that will be charged for that policy.

The defendant insurers cite us to three cases that seem to demonstrate the accuracy of that definition. The three cases cited all involved circumstances in which the rule either entirely excluded coverage for a particular category of risk (*Wilkinson v. Norcal Mutual Ins. Co.* (1979) 98 Cal.App.3d 307, 311-312 [159 Cal.Rptr. 416] [neurosurgery and orthopedic surgery excluded from coverage]; *Wilson v. Fair Employment & Housing Comm.* (1996) 46 Cal.App.4th 1213, 1221 [54 Cal.Rptr.2d 419] [flights piloted by pilots over the age of 60 excluded from coverage]), or treated all automobile losses as chargeable to the principal place of garaging the insured vehicle, rather than the location of the accident, thus impacting the rates to be charged. (*County of Los Angeles v. Farmers Ins. Exchange* (1982) 132 Cal.App.3d 77, 81-88 [182 Cal.Rptr. 879].) Such actions clearly impacted rates or conditioned coverage. In each case, the insurer had decided that either excluding categories of risks, or applying rules as to the location of charge-offs, was the method best suited to spreading its risks.

Given the relief sought by the plaintiffs, the trial court should also consider the possible application of the primary jurisdiction doctrine. (See *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 391-401;

---

[28]The defendant insurers also rely on section 1860.1; in addition to that section, the trial court should also examine the impact of section 1855.4 with respect to the viability of the exhaustion of administrative remedies argument. (See also *Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750 [92 Cal.Rptr.2d 132].)

*State Farm, supra,* 45 Cal.App.4th at pp. 1111-1112; Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2000) ¶¶ 11:317-11:320 at pp. 11-75 to 11-76.)

## CONCLUSION

The trial court correctly sustained *without* leave to amend the demurrer of the defendant insurers selling policies covering multiple vehicles. No cause of action was or can be stated against them by plaintiffs and a judgment of dismissal was properly entered. However, as to the defendant insurers selling *separate* policies covering each of multiple vehicles, the demurrer should have been sustained *with* leave to amend. But, before permitting such amendment or conducting any further proceedings in this matter, the trial court should consider and decide the issue of exhaustion of administrative remedies raised by the defendant insurers, as well as the possible application of the primary jurisdiction doctrine, giving all parties a full opportunity to brief and argue those issues.[29]

## DISPOSITION

The judgment of dismissal is affirmed in part and reversed in part. As to the several insurer defendants that issue single policies covering multiple vehicles, (i.e., other than State Farm, Farmers and Allstate), the judgment of dismissal is affirmed. As to the insurer defendants State Farm, Farmers and Allstate, the judgment of dismissal is reversed and the matter is remanded for further proceedings consistent with the views expressed herein. Each party shall bear his, her or its own costs on appeal.

Klein, P. J., and Kitching, J., concurred.

On November 20, 2001, the opinion was modified to read as printed above.

---

[29]Although plaintiffs claim that their third alleged cause of action is for fraud and constitutes a separate claim, we disagree. The allegations actually do nothing but restate plaintiffs' basic claim that the defendant insurers have entered into a conspiracy. We therefore have treated the allegations of that count as essentially part of the first two causes of action and no further or different discussion is required.