**Mohamed ELSAYED, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**MASERATI NORTH AMERICA, INC., Defendant.**

**Case No.: SACV 16-00918-CJC(DFMx)**

United States District Court, C.D. California, Southern Division.

Signed October 18, 2016

Jonathan A. Michaels, Kristen Rodriguez, Kathryn Jeanine Harvey, MLG Automotive Law APLC, Newport Beach, CA, for Plaintiff.

Eric Y. Kizirian, Dyanne Jinhyung Cho, Michael Keith Grimaldi, Zourik Zarifian, Lewis Brisbois Bisgaard and Smith LLP, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

Plaintiff Mohamed Elsayed brought this action against Defendant Maserati North America, Inc. ("Maserati"). (Dkt. 12 (First Amended Complaint [hereinafter "FAC"]).) His complaint alleges that Maserati's remote keyless entry system [hereinafter "RKE"] in its models 2014–2016 Ghibli vehicles has a life threatening defect. (*Id.* ¶¶ 1–3.) Plaintiff avers to represent a nationwide class of Ghibli owners or lessors in four causes of action: (1) Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1), (2) Breach of Express Warranty, (3) Breach of Implied Warranty of Fitness for a Particular Purpose, and (4) Breach of Implied Warranty of Merchantibility. (*Id.* ¶¶ 36, 46–74.) He brings an additional six claims on behalf of himself and a subclass of California Ghibli purchasers

or lessors: (5) Products Liability–Negligent Design, (6) Products Liability–Failure to Warn, (7) Breach of Express Warranty (seeking addition statutory penalties pursuant to Cal. Civ. Code § 1794(c)), (8) Breach of Implied Warranty of Merchantibility (seeking civil penalty under Cal. Civ. Code § 1794(e)(1)), (9) Violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and ʼ(10) Unlawful, Unfair, and Fraudulent Business Acts and Practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq. (Id.* ¶¶ 73–133.)

Before the Court is Maserati's motion for summary judgment. (Dkts. 14, 19.) For the following reasons, the motion is GRANTED.

## II. BACKGROUND

The Maserati Ghibli, model years 2014, 2015, and 2016, are equipped with a "Passive Entry System" [hereinafter "PES"]. (Dkt. 22–1 (Statement of Undisputed Facts [hereinafter "SUF"]) ¶ 2.)[1] The PES allows drivers to unlock the vehicle without having to press the RKE button onʼ the key fob. (*Id.* ¶ 2.) Among other features, to "minimize the possibility of unintentionally locking a key fob RKE transmitter inside your vehicle," the PES will unlock the Ghibli automatically under certain circumstances. (Dkt. 20–2 Ex. 1 [hereinafter "Ghibli Manual"] at 1-5.) This case arises

from the performance of that aspect of the PES.

Plaintiff leased a new 2015 Maserati Ghibli on or about August 8, 2015, for personal use by himself, his wife Mai Hazem, and their small child. (Dkt. 22–3 (Declaration of Mohamed Elsayed [hereinafter "Elsayed Decl."]) ¶¶ 2, 3.) Shortly thereafter, his wife took their son to run errands one day. (Dkt. 22–4 (Declaration of Mai Hazem [hereinafter "Hazem Decl."]) ¶ 3.)

Returning to the parking lot where she parked her car and left the ignition in the "OFF" position, Ms. Hazem opened the front passenger door and placed her purse, which included her key fob and cellular phone, on the front passenger seat, and then she closed the front passenger door. (*Id.* ¶ 3.) She then opened the rear passenger door, placed her son in his car seat, and closed the door. (*Id.* ¶ 3.) Her three-year-old son reached over and pressed the "lock" button on the rear door trim panel, which locked the car. (*Id.* ¶ 3.) Without access to her cell phone or key fob, and in a parking structure on a hot day, Ms. Hazem feared for her son's safety. (*Id.* ¶ 4.) After approximately ten to fifteen minutes of gesturing, her son pressed the "unlock" button on the rear door trim panel, unlocking the car. (*Id.* ¶ 5.)

Concerned for her son's continued safety in the Ghibli, at some point thereafter Ms.

**1.** Due to the procedural posture of this case and Plaintiff's failure to submit adequate declarations supporting the allegations in his FAC with his opposition to summary judgment, Maserati's Statement of Undisputed Facts draws on Plaintiff's First Amended Complaint. (*See* Dkt. 21.) Plaintiff states that unverified claims in a complaint are not evidence the Court can consider in evaluating a motion for summary judgment. *See Moran v. Selig,* 447 F.3d 748, 759 (9th Cir. 2006); *e.g.,* Dkt. 22–1 (Plaintiff's Statement of Genuine Disputes of Material Facts) ¶ 1. However, to the extent such claims are disputed (Plaintiff frequently states his objection and then states

the fact is "undisputed," (*see, e.g.,* Dkt. 22–1 at ¶ 1)), the Court finds such disputes are not material to the disposition of this motion. In addition, the Court notes Judge Bea's recent observation in a partial concurrence and partial dissent that "on motion for summary judgment, the unverified complaint can provide only factual evidence—admissions—against plaintiffs; never for plaintiffs." *Payne v. Peninsula Sch. Dist.,* 653 F.3d 863, 895 n.12 (9th Cir. 2011), *overruled on other grounds by Albino v. Baca,* 747 F.3d 1162 (9th Cir. 2014); *cf.* Dkt. 23 at 2 n.1 (incorrectly characterizing Judge Bea's statement as a Ninth Circuit holding).

Hazem contacted a Maserati dealership. (*Id.* ¶ 6.) The dealership's response was that the car acted the way it was supposed to. (*Id.* ¶ 6.) Unsatisfied, she contacted Maserati itself. (*Id.* ¶ 7.) The service representative was shocked and told her it should not have happened. (*Id.* ¶ 7.) When she called a week later, however, Maserati informed her that there was nothing they could do to assist her. (*Id.* ¶ 7.) Plaintiff also complained to Ferrari Maserati of Las Vegas in February 2016 when the car was in for service. (SUF ¶ 8.) Ferrari Maserati of Las Vegas noted, "doors working as designed." (*Id.* ¶ 8).

Plaintiff's claim that the PES should have unlocked the car (and the PES' failure to do so constitutes a defect) is premised on several statements made in (1) the Ghibli eBrochures, (2) the Ghibli's Owner's Manual, (3) the Quick Reference Guide [hereinafter "QRG"], and (4) the vehicle warranty card.[2]

*eBrochures.* The 2015 Ghibli eBrochure states that "Maserati made passive safety a top priority when designing the Ghibli. To provide the best possible protection for its occupants and help it achieve its aim of a 5-Star Safety Rating by EURO NCAP and US NCAP, it features the latest generation air bag system and a special front-end crumple structure." (Dkt. 20–2 Ex. 7 at 7-3.) The 2015 eBrochure goes on to tout the seven dual stage air bags, the seat belt pretensioners, and the active headrests. (*See id.*)

The 2016 eBrochure is substantially identical to the 2015 eBrochure, (*see* Dkt. 20–2 Ex. 6 at 6-3), but expands on several important features of the vehicle, (*see id.* at 6-4–6-6). While PES is not mentioned, the key fob more broadly is included under the subsection "Comfort and Functionality," not the "Safety" subsection. (*Compare id.* at 6–6 *with id.* at 6–4–6–5.)

*Owner's Manual.* The Ghibli Owner's Manual begins with the statement that, "[w]ithin the text, important warnings and notes are easily identifiable through icons." (Ghibli Manual at 1-2.) "Notes" are defined as "[a]dditional information regarding the subject and/or the operation described." (*Id.*)

The manual has a paragraph titled, "Preventing Inadvertant Locking of the

---

**2.** In his opposition to summary judgment, Plaintiff claims that he did not receive the Ghibli Quick Reference Guide or vehicle warranty booklet when he leased the vehicle and that he can still not locate them. (Dkt. 22–3 ¶¶ 4–5.) Even though Maserati provides copies of those documents, (Dkt. 20–1 Exs. 2 (warranty card), 4 (QRG)), Plaintiff disputes Maserati's purported undisputed fact based on the warranty card and one of the facts based on the QRG (but not the other four). (*See* SUF ¶ 36 (warranty); *compare id.* ¶¶ 11, 12, 13, 14 (not objecting to QRG facts) *with id.* ¶¶ 38 (objecting to QRG fact).) Since the QRG fact to which Plaintiff objects parrots an equivalent statement in the owner's manual, which Plaintiff states is undisputed, the objected-to QRG does not affect the resolution of this motion. (*Compare id.* ¶ 38 (objecting to QRG fact) *with id.* ¶ 39 (same fact in owner's manual undisputed).) The warranty card fact is substantially identical to the Plaintiff's description of the warranty in his FAC, for which he presents no evidentiary support in his summary judgment opposition. (*See id.* ¶¶ 36, 48; FAC ¶ 27; Dkt. 22.) The Court will rely on the warranty card only the extent to which it is identical to what Plaintiff alleges in the FAC.

Plaintiff also disputes Maserati's assertions that the Ghibli brochure was available on the Maserati website. (SUF ¶¶ 30, 31.) However, Plaintiff does not dispute the substance of the eBrochure, which includes statements identical to those on which he relies in his FAC. (*See id.* ¶¶ 32–35, 42–47; FAC ¶ 30; Dkt. 22.) The Court finds that the presence or absence of the eBrochure on Maserati's website does not impact the resolution of this motion, since Plaintiff does not dispute the substantive claims made within the eBrochure and on which his FAC evidently relies.

Key Fob RKE Transmitter Inside the Vehicle." (*Id.* at 1–5.) The paragraph states,

> To minimize the possibility of unintentionally locking a key fob RKE transmitter inside your vehicle, the Passive Entry system is equipped with an automatic door unlock feature which will function if the ignition switch is in the **OFF** position. If one of the vehicle doors is open and the door panel [lock] switch is used to lock the vehicle, once all open doors have been closed the system checks the inside and outside of the vehicle for any valid key fob RKE transmitter. If one of the vehicle's key fobs RKE transmitter is detected inside the vehicle, and no other valid key fobs RKE transmitter are detected outside the vehicle, the Passive Entry system automatically unlocks all vehicle doors
> . . . .

(*Id.* at 1–5 (emphasis in original).) Following the paragraph are two "Notes" which present bulleted lists. The first one states: "The vehicle unlocks the doors under any of the following conditions: [1] the doors are manually locked using the door lock knob positioned on the door panel, [2] there is a valid key fob RKE transmitter inside the vehicle, [3] there is not a valid key fob RKE transmitter outside the vehicle." (*Id.* at 1–5.) Under the first bullet (referencing the door lock knob on the door panel) is an image of the front, driver's side door trim panel and an arrow pointing toward a button on that panel. (*Id.* at 1–5.) On the same page, prior to the paragraph in question, there are directions on unlocking the car which note that the "interior door panel lock knob will rise when the door is unlocked." (*Id.* at 1–5.) The image underneath that text is of the front passenger door, with an arrow indicating that the door panel lock knob is the apparatus that rises from the area where the door panel ends and the door window begins when the car is unlocked. (*Id.* at 1–5.)

The second "Note" following the lockout paragraph states, "The vehicle will not unlock the doors under any of the following conditions: [1] the doors are locked using the key fob RKE transmitter, [2] the doors are locked using the button on the Passive Entry front door handles, [3] there is a valid key fob RKE transmitter outside the vehicle and within 5ft (1.5m) of either Passive Entry front door handle, [4] three attempts are made to lock the doors using the door panel switch and then close the doors [sic]." (*Id.* at 1–5–1–6.) The accompanying image following the second bullet indicates that the "Passive Entry front door handles" are the handles on the *exterior* of the car which people use to open the door from the outside. (*See id.* at 1–6.)

The manual also discusses how the doors of the Ghibli lock. On one page, a paragraph with the heading "Power Doors Locking/Unlocking" states, "A power door lock switch and a power door unlock switch are positioned on the front door trim panel. Use this switches [sic] to lock or unlock the doors." (Dkt. 22–2 Ex. A (Plaintiff's Ghibli Manual Selections) at 3.) Following that statement are images of the insides of the front driver's side door trim panel and the front passenger's side door trim panel. (*See id.*) In each, arrows point toward the door trim panel switches. (*See id.*) A few pages later, in the section following the PES discussion, the manual reads, "The vehicle doors can also be locked by using the . . . lock button located on the vehicle's inner door panel." (*Id.* at 6.) That statement is followed by two images: (1) an image of the driver's side front door trim panel with an arrow pointing to the power lock switch and (2) a passenger's side trim panel with an arrow pointing to the power

lock switch. (*See id.* at 6.)[3]

Three other important statements are made in the manual. First, the manual repeatedly warns Ghibli operators to "not leave the key fob in or near the vehicle .... A child could operate power windows, other controls, or move the vehicle." (Ghibli Manual at 1-4, 1-7; Dkt. 22–2 Ex. A at 3.) Second, the manual states that "All key fobs provided with the new vehicle have been updated with the vehicle electronics and are therefore able to guarantee correct functioning and protection." (Dkt. 22–2 Ex. A at 2.) Third, the manual discusses the Maserati Roadside Assistance program, which is available all day, every day, and includes lockout services.[4] (Ghibli Manual at 1-3.)

*Quick Reference Guide.* The QRG does not replace the owner's manual, but acts as a summary to help drivers "identify and quickly learn the use of the vehicle commands in order to perform some required operations and safely drive your Maserati." (Dkt. 20–2 Ex. 4 (QRG) at 4-2.) Accordingly, it directs readers to read it through and to also read the owner's manual. (*See id.* at 4–2.) The QRG includes an image of the rear passenger area under the heading "Controls—Briefly." (*Id.* at 4–3.) The image associates the number "7" with the passenger's side rear door trim panel switches, which are described as "Centralised door locking/unlocking switches." (*Id.*

at 4–3.) In the later section titled "Using the Controls," under the heading "Centralised door locking," the QRG states, "The centralized door locking switch is located on the door trim panel of each door. Use this switch to lock all doors from inside." (*Id.* at 4–4.) Following that statement are images of the driver's side front trim panel and the passenger's side rear door trim panel; on both there are arrows pointing toward the door lock switches. (*Id.* at 4–4.)

*Warranty Card.* Finally, the Ghibli warranty card states that Maserati warrants each new Maserati "to be free under normal use and service from defects in material and workmanship" for four years. (Dkt. 20–2 Ex. 2 at 2-2; *see also* FAC ¶ 27.)

## III. LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue

---

**3.** Notably, the second picture is present in the copy of the manual Plaintiff provides but is absent in the Maserati's submitted copy. (*Compare* Dkt. 22–2 Ex. A at 6 with Ghibli Manual at 1-6.)

**4.** Plaintiff includes in his submission a page from the manual discussing the "Child-Protection Door Lock System—Rear Doors." (Dkt. 22–2 Ex. A at 4.) The manual states that on the inside of the door frame there is a way to set the door to further protect "small children sitting in the rear seat." (*Id.* at 4.) Plaintiff does not, however, mention this system in

his briefing. (*See* Dkts. 17, 22.) Rather, he just includes it in his response to Maserati's Statement of Undisputed Facts as an additional relevant fact whenever Maserati cites the manual. (*See* SUF ¶¶ 6, 9, 15, 22.) The system, by all accounts, prevents the rear doors from being opened from the inside when it is engaged. (*See* Dkt. 15 Ex. 1 at 8.) Since Plaintiff does not allege that the system was operational and does not specify how it is relevant to his claim of breach of express or implied warranties, the Court need not consider these references.

of material fact. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law. *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249, 106 S.Ct. 2505.

Where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position. Fed. R. Civ. P. 56(c)(1)(A)–(B). The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence

on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party, and draw all justifiable inferences in its favor. *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

## IV. DISCUSSION

Plaintiff's theory is essentially this: when (1) the Ghibli's doors are closed, (2) the ignition switch is in the OFF position, (3) a key fob is inside the car, (4) another key fob is not immediately outside the car, and (5) the rear door trim panel lock button is pressed, resulting in each door of the car locking, then (6) the PES should unlock the car. The ten causes of action allege that the PES' failure to unlock the car in these circumstances breaches express warranties, constitutes negligent design and failure to warn, violates implied

warranties, and violates the California's Consumers Legal Remedies Act and Unfair Competition laws. None of these causes of action survive summary judgment.

## A. EXPRESS WARRANTY CLAIMS

Plaintiff asserts three causes of action that depend in whole or in part on the presence of an express warranty: (1) Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1), (Compl. ¶¶ 46–58); (2) Breach of Express Warranty (national class), (*id.* ¶¶ 59–64); and (7) Breach of Express Warranty (California subclass), (*id.* ¶¶ 89–104).

■ Contrary to Plaintiff's assertion, no express warranty was breached by Maserati. The Ghibli's owner's manual *explicitly* states that the PES unlocks the Ghibli *only* when (1) the ignition switch is in the OFF position, (2) at least one of the vehicle's doors are *open*, (3) one of the door trim panel lock buttons is pressed, and *then*, (4) after all doors are closed, if the car detects a key fob inside the car without another key fob outside the car, the PES will unlock the car. (Dkt. 22–2 Ex. A at 5.) Plaintiff's situation is significantly different—the door trim panel lock button was pressed *after* the car doors were all closed. (Hazem Decl. ¶ 3.) No express warranty was made by Maserati covering that situation.

Plaintiff's reliance on the summary statements in the accompanying note is misplaced. Read out of context, the note does literally state that when *any* of three conditions are met the PES will unlock the vehicle ( [1] the doors are manually locked using the door lock knob positioned on the door panel,[5] [2] there is a valid key fob RKE transmitter inside the vehicle, [3] there is not a valid key fob RKE transmitter outside the vehicle,[6] (Dkt. 22–2 Ex. A at 5)). However, read in context, Maserati's use of "any" does not mean that each condition is independently sufficient for PES operation. For example, if the third condition alone were sufficient, then the Ghibli would unlock *whenever* there was not a key fob outside the car. If that were the case, the car would not stay locked even when all doors are closed and the driver attempts to turn on the car. Such a result is illogical and completely contradicted by both the preceding paragraph's clear statement that multiple conditions are necessary for PES operation and the manual's statement that the notes supplement rather than supplant the text. (*See* Ghibli Manual at 1-2.) When the entire text and notes are read together, it is obvious that the note lists a set of necessary but not sufficient conditions for the PES to unlock the car.

The manual's statement that the PES will not unlock the Ghibli when "the doors

---

5. As noted above, there is a discrepancy between the note text, which references the lock knob, and the image, which highlights the door trim panel lock button. (*See* Ghibli Manual at 1-2.) However, such discrepancy is immaterial. Either way, the note read in context indicates that when the lock knob is manually locked or the door trim panel button is pressed, along with the other conditions, the PES unlocks the car.

6. The manual's note must be referencing the requirement stated in the preceding paragraph that there *not* be a *valid* key fob outside

the vehicle for the PES to unlock the Ghibli, even though it states "there is a not valid key fob ... outside the vehicle." (Dkt. 22–2 Ex. A at 5; *see also id.* at 6 (stating that the PES will *not* unlock when there is a *valid* key fob outside the vehicle).) Otherwise, the manual would state that the PES would unlock the car whenever there is a key fob *not* associated with the car in its vicinity. That reading, if accurate, further highlights that the three conditions cannot be independently sufficient since then the PES would leave a welcome mat for thieves.

are locked using the button on the Passive Entry front door handles" similarly fails to create an express warranty. (Dkt. 22–2 Ex. A at 5.) Plaintiff, relying on that statement, argues that "the vehicle's doors should *not* lock when the keys are inside the vehicle and the ignition is in the OFF position, unless the doors are manually locked using the buttons on the *front door handles*. When the keys are inside the vehicle and the *rear* door locks are manually pressed, the doors should not lock." (Dkt. 22 at 10 (emphasis in original); *see also id.* at 11.) Plaintiff is confusing the Passive Entry front door handles, which are on the *exterior* of the car (as clearly shown by the image following the statement in question, (*see* Dkt. 22–2 Ex. A at 6)) and have a button on them, with the front door trim panel lock button, which is on the *inside* of the car, (*see id.* at 3). Needless to say, the manual's statements about the PES and the *exterior* front handle button are irrelevant to the existence of any express warranty as to the performance of the PES when an *unrelated rear interior* button is pressed.[7]

Plaintiff also argues that Maserati's eBrochure statement that it "made passive safety a top priority when designing the Ghibli" creates an express warranty about the PES. (Dkt. 20–7 Ex. 6 at 6-3; Dkt. 20–8 Ex. 7 at 7-3; Dkt. 17 at 13.) Plaintiff is again mistaken. His argument is predicated on the use of "passive" in "passive entry system" tying the PES to "passive safety." However, the PES is not part of any passive safety. Passive safety in the

automobile context refers to design measures taken to protect individuals in the event of a collision, such as airbags and seat belts. *See* 49 C.F.R. § 571.208 ("Standard 208"); *Harris By & Through Harris v. Ford Motor Co.*, 110 F.3d 1410, 1412 (9th Cir. 1997) ("Standard 208 ... governs the passive safety restraints automobile manufacturers must install. For cars manufactured after September 1, 1989, Standard 208 gives automobile manufacturers the option of installing either an airbag or an automatic seatbelt ...."); *Pokorny v. Ford Motor Co.*, 902 F.2d 1116, 1123 (3d Cir. 1990) ("[C]ertain types of passive safety systems, most particularly air bags and automatic seat belts, could become mandatory in motor vehicles ...."); *Pub. Citizen v. Steed*, 851 F.2d 444, 445 (D.C. Cir. 1988) ("That provision relaxes the requirement that all passenger automobiles manufactured after September 1, 1989 be equipped with automatic or "passive" safety devices in the outboard front seats ... by installing (1) a non-belt automatic restraint system such as an air bag on the driver side ...."); *Graves ex rel. W.A.G. v. Toyota Motor Corp.*, No. 2:09CV169KS–MTP, 2012 WL 38745, at *2 (S.D. Miss. Jan. 9, 2012) ("From a rollover occupant protection standpoint, it is a scientific fact that a comprehensive occupant protection 'system' must include three key components of passive safety .... First, a safety belt system that provides and maintains appropriate fit, comfort, and proper coupling of the occupant to the vehicle seat, with ap-

---

**7.** Alternatively, Plaintiff may be reading the manual's statement on the front door handles' lock button as indicating that the button must be pressed is necessary to prevent PES functionality. That reading is implausible. The statement in question is part of a list of conditions under any of which the PES will not function. (Dkt. 22–2 Ex. A at 5.) Plaintiff's reading would turn that on its head, making each of those conditions necessary to prevent

PES functionality. The condition immediately prior to the one Plaintiff references states that the PES will not unlock the car when the key fob is used to lock the car. (*Id.*) It makes no sense for the Ghibli to only stay locked when *both* the external button and the key fob are used to lock the car—drivers typically utilize one, not several, methods for locking their cars.

propriate energy attenuation capability for the foreseeable range of occupant sizes. Second, a body structure that maintains the occupant survival space and does not pose an unreasonable risk of injury to belted occupants. Third, effective restraint and structural integrity so as to prevent lateral head impacts and partial ejection through side window portals.") (quoting expert report). Nothing in the Ghibli materials even hints at any different meaning of passive safety. (*See* Dkt. 20–7 Ex. 6 at 6-3–6-6; Dkt. 20–8 Ex. 7 at 7-3.) Indeed, the PES is not mentioned on the passive safety pages. (*See id.*)

Plaintiff also relies on Maserati's actual warranty, which covers any vehicle part that is defective. (Dkt. 17 at 13; *see also* Dkt. 20–3 Ex. 2; FAC ¶ 27.) A defect, however, is a deviation between PES operation and the manual's statements. (Dkt. 17 at 13.) As discussed above, there is no such deviation. Furthermore, the warranty covers defects in material or workmanship, not design defects. (*See* Dkt. 20–3 Ex. 2 at 2-2.) Plaintiff argues that his FAC includes the term "manufacturing defect," (*see* FAC ¶¶ 32, 62, 72), and therefore Maserati's warranty is applicable, (*see* Dkt. 17 at 14). However, a "product has a 'manufacturing defect' if and only if the product caused a plaintiff's injury because it deviated from the manufacturer's intended result or from other ostensibly identical units of the same product line. For example, when a product comes off the assembly line in a substandard condition, it has incurred a manufacturing defect." *Morris v. Parke, Davis & Co.*, 667 F.Supp. 1332, 1334–35 (C.D. Cal. 1987) (citing *Barker v. Lull Engineering Company, Inc.*, 20 Cal.3d 413, 429, 143 Cal.Rptr. 225, 573 P.2d 443 (1978)). "In contrast, in the case of a design defect the injury producing agent is common to all products of a certain line, and the defect lies in the original design or model." *Id.*

Plaintiff's FAC contains no allegation that his Ghibli is different than Maserati's design or that the PES functions differently than other correctly-produced PES. (*See* FAC.) Rather, Plaintiff seeks to certify a nationwide class of all Ghibli owners. (*See id.*) Simply stated, the alleged defect is a design defect and, thus, Maserati's actual warranty has no application here.

Plaintiff also argues that, because the manual warrants the correct functionality of the key fob, (*see* Dkt. 22 at 9; Dkt. 22–2 Ex. A at 2), it creates (and Maserati breached) a warranty promise that the key fob will never get locked in the car. (*See* Dkt. 22 at 11 ("Again, because a small child can lock the vehicle from the rear of the car, when the engine is off and the key fob is inside the vehicle, the vehicle does not perform as represented and a breach of warranty has occurred."); Dkt. 17 at 12 ("For example, . . . the vehicle's owner's manual provides that safety features exist to *prevent* the locking of keys in the vehicle. Unlike mere 'puffery,' such as a claim that a product is of 'good quality,' the cited language contains factual assertions that can be objectively verified through discovery: can a driver *lock his keys* (and in this case, his child) in the vehicle?") (emphasis added).) The manual, however, makes no such assertions. Rather, it makes clear that PES exists "[t]o *minimize* the possibility of unintentionally locking a key fob RKE transmitter inside your vehicle," not to preclude such occurrence entirely. (Dkt. 22–2 Ex. A at 5 (emphasis added).)

Finally, Plaintiff attempts to derive an express warranty from Maserati's claim that the Ghibli has "[s]tate of the art engineering," which "inevitably enhances the Ghibli's reliability, for which Maserati is world renowned." (Dkt 17 at 7; *see also* FAC ¶ 30; SUF at 30.) But Maserati's statements in this regard constitute straightforward examples of "generalized,

nonactionable puffery." *Vitt v. Apple Computer, Inc.*, 469 Fed.Appx. 605, 607 (9th Cir. 2012) (affirming dismissal on basis that descriptors such as "durable," "reliable," and "high performance" were not actionable); *see Marcus v. Apple Inc.*, No. C 14–03824 WHA, 2015 WL 151489, at *5 (N.D. Cal. Jan. 8, 2015) ("This order detects nothing 'specific or measurable' about the phrases 'Most Advanced Notebook Ever' or 'State-of-the-Art.' Those representations 'and the four put forth in the complaint constitute non-actionable puffery."). They fall far short of creating any express warranty, let anone one covering the situation when Plaintiff's son locked himself in Plaintiff's Ghibli.[8]

Despite Plaintiff's numerous arguments to create an express warranty from Maserati that covers the unfortunate situation when his son locked himself in Plaintiff's Ghibli, the undeniable fact is that Maserati made no express warranty covering that situation. Maserati did not make such an express warranty in the eBrochures. It did not make one in the Owner's Manual. It did not make one in the QRG. And it did not make one in the Warranty Card. Consequently, Maserati is entitled to summary judgment on all of Plaintiff's causes of action alleging breach of an express warranty.

## B. NEGLIGENT DESIGN AND FAILURE TO WARN

■■ Plaintiff's fifth and sixth causes of action depend on Maserati's negligence—(5) Products Liability–Negligent Design, (Compl. ¶¶ 75–80), and (6) Products Liability–Failure to Warn, (Compl. ¶¶ 81–88). Those claims are subject to the economic loss doctrine, which states that in"actions for negligence, a manufacturer's liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone." *Aas v. Superior Court*, 24 Cal.4th 627, 636, 101 Cal.Rptr.2d 718, 12 P.3d 1125 (2000) (citing *Seely v. White Motor Co.*, 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 403 P.2d 145 (1965)), *superseded by statute on other grounds*, Cal. Civ. Code §§ 895–945.5. The doctrine has four exceptions: "[i]n the absence of (1) personal injury, (2) physical damage to property, (3) a "special relationship" existing between the parties, or (4) some other common law exception to the rule, recovery of purely economic loss is foreclosed." *Id.* (citing *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979)).

■ As an initial matter, Plaintiff has presented no evidence to establish any injury or loss beyond an economic one. Tellingly, Plaintiff's complaint alleges only economic loss. (*See* Compl. ¶¶ 4–5 ("As a result of Maserati's ... failure to disclose defects in the Ghibli's Passive Entry System, owners and/or lessees of the Class Vehicles have suffered losses in money and/or property. ... [T]hey would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did."); *id.* at ¶ 34 ("As a result, Plaintiff and the Class Members will suffer actual harm and damages including but not limited to ... premium prices .... Plaintiff and the Class Members would not have purchased" the Ghi-

---

8. The Court notes that Plaintiff seems to gesture at a different claim—that the ability of the rear door trim panel lock button to lock the entire car (and/or its ability to do so with a fob in the car) is defective. (*See, e.g.,* Dkt. 22 at 11.) While the QRG clearly indicates such functionality, the manual presented to the Court is less clear. (*Compare* Dkt. 20–5 Ex. 4 at 4-3 *with* Dkt. 22–2 Ex. A at 3.) Plaintiff, however, presented no evidence to support such a design defect claim. Since Plaintiff's claim rests instead on the specific PES functionality described above, the Court need not consider this unsupported and not alleged claim.

bli.); *id.* at ¶¶ 130, 132 (Plaintiff "would not have paid the prices he did" and "Plaintiff and Class Members are entitled to . . . an order disgorging from Defendant and restoring to Members of the Class all monies . . . ."); *id.* at Prayer for Relief (seeking "[a]n order awarding restitution for out-of-pocket expenses and economic harm").) The closest Plaintiff comes to claiming personal injury is when he describes the story of his wife and son's experience as being a "harrowing" story. (*Id.* ¶ 23.) Nevertheless, Plaintiff's opposition to summary judgment for the first time claims that "as a result of the threat to Plaintiff's son [sic] life, Plaintiff has suffered more than mere damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits. For example, the Plaintiff has suffered emotional distress and stress as a result of the life-threatening defect that continues to exist in his vehicle." (Dkt. 22 at 14.) Plaintiff, however, fails to present any evidence to support his claim of emotional distress. (*See* Elsayed Decl.)

Plaintiff argues that his newly-stated emotional distress is within the personal injury exception to the economic loss doctrine. (Dkt. 22 at 14–15 (referencing *Aas*, 24 Cal.4th at 636, 101 Cal.Rptr.2d 718, 12 P.3d 1125 ("In the absence of (1) personal injury . . . recovery of purely economic loss is foreclosed.")).) Plaintiff is wrong. For the personal injury exception to apply, he must have a feasible tort claim for his emotional distress. *See Aas*, 24 Cal.4th at 643, 101 Cal.Rptr.2d 718, 12 P.3d 1125 ("[C]onduct amounting to a breach of contract becomes tortious when it also violates a duty independent of the contract arising from principles of tort law." (quotation omitted)); *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979, 988–90, 22 Cal.Rptr.3d 352, 102 P.3d 268 (Cal. 2004) ("Put simply, the economic loss doctrine was created to prevent the law of contract

and the law of tort from dissolving one into the other. . . . 'Tort damages have been permitted in contract cases where a breach of duty *directly* causes *physical* injury . . . . [A] tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort . . . .'" (quoting *Erlich v. Menezes* 21 Cal.4th 543, 551–52, 553–54, 87 Cal.Rptr.2d 886, 981 P.2d 978 (1999)) (emphasis added).). Plaintiff has no feasible tort claim for his emotional distress here.

■ Ms. Hazem, Plaintiff's wife, clearly felt emotional distress. (Compl. ¶ 21 (describing her reaction as frantic and including "fear that her son would overheat and perish in the car"); Hazem Decl. ¶ 4 (same).) But Plaintiff himself was not present for the lock out. (SUF ¶¶ 4–5.) "In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress [are] recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is *present* at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and, (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness." *Thing v. La Chusa*, 48 Cal.3d 644, 647, 257 Cal.Rptr. 865, 771 P.2d 814 (1989) (emphasis added) (denying emotional distress claim to mother who neither saw nor heard son's injury in a car accident).

Plaintiff also argues that there is a special relationship between himself and Maserati that makes the economic loss doctrine inapplicable here. (Dkt. 22 at 15; *see Aas*, 24 Cal.4th at 636, 101 Cal.Rptr.2d 718, 12 P.3d 1125 ("In the absence of . . . (3) a "special relationship" existing between the parties . . . recovery of purely economic loss is foreclosed.").) He asserts he has such a special relationship with

Maserati because Maserati had "reason to know or expect the particular purposes for which the vehicle was purchased by Plaintiffs [sic] (i.e., transportation of Plaintiff and his family)." (Dkt. 22 at 15.)

Plaintiff misunderstands the special relationship exception to the economic loss doctrine. The underlying purpose of the special relationship exception is to define particular "circumstances in which a party has a duty of care to avoid imposing economic losses on third parties." *Mega RV Corp. v. HWH Corp.*, 225 Cal.App.4th 1318, 1340, 170 Cal.Rptr.3d 861 (2014), *as modified on denial of reh'g* (May 20, 2014) (holding that RV repair company which repaired RV for owner did not have a duty to manufacturer of hydraulic components); *see also J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979) (delineating the special relationship exception and holding that airport restaurant had special relationship with contractor who contracted with airport operator to renovate the airport, allowing restaurant to recover lost profits arising from construction delays caused by contractor); *Biakanja v. Irving*, 49 Cal.2d 647, 648–51, 320 P.2d 16 (1958) (holding that a decedent's intended beneficiary had a special relationship with the notary public who had prepared a defective will).

Plaintiff is not a third party in relation to Maserati. To the contrary, his relationship with Maserati was a direct one. The Court refuses to extend the special relationship exception to encompass direct relationships. In *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979), the California Supreme Court articulated a six factor test for the presence of a special relationship: "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury,

(4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm." *Id.* at 804, 157 Cal.Rptr. 407, 598 P.2d 60. Those factors make clear why extension to direct relationships is unwarranted. The first, second, and fourth *J'Aire* factors would almost *always* find a special relationship between directly-contracting parties: the transaction would always be intended to affect the plaintiff, the harm would nearly always be foreseeable, and the connection between the defendant's conduct and the injury would always be close. Such a result is directly contrary to the special relationship's status as a *narrow* exception to the economic loss doctrine. *See, e.g., Zamora v. Shell Oil Co.*, 55 Cal.App.4th 204, 211, 63 Cal.Rptr.2d 762 (1997) ("*J'Aire* sets forth a limited exception to the general rule . . . ."). Furthermore, implicit in the fifth and sixth *J'Aire* factors is the test's applicability to third parties: moral blame and preventing future harm is tied to shifting harms to defenseless third parties.

Rather than applying *J'Aire*, Plaintiff solely relies on the second factor, foreseeability of harm. (Dkt. 22 at 15 ("Defendant, as a vehicle manufacturer, had reason to know or expect the particular purposes for which the vehicle was purchased by Plaintiffs [sic] (i.e., transportation of Plaintiff and his family). Accordingly, a special relationship exists."); *cf. Kalitta Air, L.L.C. v. Cent. Texas Airborne Sys., Inc.*, 315 Fed.Appx. 603, 606 (9th Cir. 2008) (admonishing courts to weigh all six *J'Aire* factors and that the presence or absence of any one factor is not decisive).) Plaintiff's argument on foreseeability of harm, however, is unavailing. A " 'special relationship' permitting recovery for purely economic loss exists between a manufacturer and a commercial

consumer, where the manufacturer knew the product was destined for a *particular* consumer and for a *particular* use." 50A Cal. Jur. 3d Products Liability § 25 (emphasis added). Maserati did not design the Ghibli with Plaintiff, or any *particular* use, in mind. Were the rule to merely require foreseeable use by *any* consumer, the special relationship exception to the economic loss doctrine would swallow the rule. Without Maserati customizing the Ghibli for Plaintiff and his son, the Court cannot find foreseeability of harm.

Simply stated, Plaintiff's negligence causes of action are barred by the economic loss doctrine and no exceptions to that doctrine apply here. Consequently, Maserati is entitled to summary judgment on Plaintiff's fifth and sixth causes of action.

### C. IMPLIED WARRANTIES

Plaintiff alleges four causes of action that depend in whole or in part on the presence and breach of an implied warranty: (1) Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1), (Compl. ¶¶ 46–58); (3) Breach of Implied Warranty of Fitness for a Particular Purpose, (Compl. ¶¶ 65–68); (4) Breach of Implied Warranty of Merchantibility (nationwide class), (Compl. ¶¶ 69–74); and (8) Breach of Implied Warranty of Merchantibility (California subclass), (Compl. ¶¶ 105–14). The PES functionality challenged here does not breach either the implied warranty of fitness for a particular purpose or the implied warranty of mercantability.

██ Plaintiff argues that, because the PES "allows the inadvertent locking of a driver's keys in the vehicle, at times trapping small children inside," the Ghibli is "not fit for [its] ordinary purpose or [sic] providing reasonably reliable and safe transportation." (FAC ¶¶ 109, 71; *see also id.* ¶ 66.) The situation that Plaintiff's wife faced is not the only way a child is capable

of locking himself or herself into a vehicle. Maserati chose to develop and include a feature that eliminates one of those ways—key in car, engine off, child opens door, sits in car, pushes lock button, closes door. Its choice does not mean that its failure to preclude a different way—child and key in car, engine off, doors closed, child pushes lock button—renders the Ghibli unmerchantable or unfit for providing reasonably reliable and safe transportation.

Plaintiff correctly states that "merely because a vehicle provides transportation from point A to point B," does not mean that "it necessarily does not violate the implied warranty of merchantability." (Dkt. 22 at 11–12 (quoting *Isip v. Mercedes–Benz USA*, LLC, 155 Cal.App.4th 19, 27, 65 Cal.Rptr.3d 695 (2007)).) However, cases finding breaches of the implied warranties of merchantability or fitness for a particular purpose involve vehicles whose behavior is deviant, not commonplace. *See, e.g., Isip*, 155 Cal.App.4th at 27, 65 Cal. Rptr.3d 695 ("A vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose."); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prod. Liab. Litig.*, 890 F.Supp.2d 1210, 1222 (C.D. Cal. 2011) (allegation of defect that "delays braking and dangerously increases stopping distance" suffices). The Ghibli eliminates *one* way in which children can end up locked in. It therefore presents *less* (or at worst the same) risk of children locking themselves in than every other car. There is no breach of any implied warranties because the Ghibli—including its PES—is "roadworthy in its present condition without any repairs." *Brand v. Hyundai Motor Am.*, 226 Cal. App.4th 1538, 1548, 173 Cal.Rptr.3d 454 (2014), *as modified on denial of reh'g* (July 16, 2014).

Because all of Plaintiff's other claims of warranty fail, his Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1), claim fails as well. Plaintiff and Maserati correctly agree that Magnuson-Moss claims depend on the presence of other viable warranty claims. (Dkt. 22 at 13; Dkt. 20 at 23; Dkt. 14–1 at 9–10; Dkt. 17 at 17; *see also Daugherty v. Am. Honda Motor Co.*, 144 Cal.App.4th 824, 833, 51 Cal.Rptr.3d 118 (2006), *as modified* (Nov. 8, 2006) ("[F]ailure to state a warranty claim under state law necessarily constituted a failure to state a claim under Magnuson–Moss."). The Court GRANTS Maserati's summary judgment motion as to Plaintiff's causes of action alleging breach of an implied warranty.

## D. CLRA AND UCL CLAIMS

Plaintiff's ninth and tenth causes of action are (9) Violation of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, (Compl. ¶¶ 115–24), and (10) Unlawful, Unfair, and Fraudulent Business Acts and Practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), (Compl. ¶¶ 125–33). The Court grants summary judgment on these claims as well.

Both of Plaintiff's claims depend on Maserati making affirmative misrepresentations to Plaintiff. (*See* FAC ¶¶ 119, 127; Dkt. 22 at 17–18.) The specific misrepresentations Plaintiff claims are the same ones from which he alleges an express warranty arises: that (1) safety features exist to prevent the locking of keys in the vehicle, (2) that "Maserati made passive safety a top priority when designing the Ghibli," and (3) "a toddler, sitting in the *rear seat* of the vehicle has the ability to lock all of the vehicle doors despite assur-

ances in the vehicle's owner's manual that this should not occur." (Dkt. 17 at 18 (emphasis in original); *see* Dkt. 22 at 15.) As discussed above, (1) the PES is wholly unrelated to passive safety, (2) the manual does not state that when all doors are closed PES will unlock the car even when a toddler locks it from the rear seat, and (3) PES decreases the chance of locking the key fob in the car but does not eliminate it entirely. Accordingly, Maserati made no affirmative misrepresentations.

To the extent Plaintiff's CLRA and UCL claims are based on omissions, they are similarly unavailing. Plaintiff seems to argue that Maserati should have disclosed "the lack of safety features on the PES, which allows a small child to lock himself in the vehicle from the rear seat." (Dkt. 17 at 19; *see also id.* at 18 ("undisclosed PES defects"); *id.* at 21 ("Maserati's nondisclosures regarding the safety and functionality of its PES.").) Maserati did not fail to disclose the functionality of the PES—the manual makes clear that it unlocks the car when the car is locked while at least one door is open; the QRG clearly states that the rear doors lock the car. On top of that, the manual repeatedly warns Ghibli operators to "not leave the key fob in or near the vehicle .... A child could operate power windows, other controls, or move the vehicle." (Ghibli Manual at 1-4; *id.* at 1–7.) As noted above, children can lock themselves into cars in various ways; Maserati need not state the obvious to Plaintiff.

Plaintiff's complaint alleges that Maserati's actions and omissions violate the UCL's prohibition on unfair, deceptive, and misleading advertising.[9] His claim

---

**9.** Plaintiff's complaint gestures at the argument that Maserati violated the UCL unlawful prong as well. (*See, e.g.,* Compl. ¶ 126.) However, Plaintiff fails to explicitly allege the

predicate violations necessary for such a claim. In any event, since Plaintiff's CLRA claims fail, any UCL unlawful prong claim also fails. (*See* Dkt. 17 at 24 (citing *Falk v.*

rests on the same allegedly misleading disclosures and omissions on the part of Maserati. (*See* Dkt. 17 at 23.) As discussed above, there were no misleading disclosures or omissions.

Furthermore, to the extent Plaintiff is making a more general UCL unfair business practice claim, the UCL standard for "unfair" is not met. "Cases have employed three different criterion to determine whether a business practice is 'unfair' under the UCL." *Moran v. Prime Healthcare Mgmt., Inc.*, No. G051391, 3 Cal. App.5th 1131, 208 Cal.Rptr.3d 303, 317, 2016 WL 5815785, at *10 (Cal. Ct. App. Sept. 14, 2016); *see Yanting Zhang v. Superior Court*, 57 Cal.4th 364, 380 n.9, 159 Cal.Rptr.3d 672, 304 P.3d 163 (2013) (noting that the "standard for determining what business acts or practices are 'unfair' in consumer actions under the UCL is currently unsettled," listing each standard, without resolving the conflict). One is: "an 'unfair' business practice occurs when that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Lueras v. BAC Home Loans Servicing, LP*, 221 Cal. App.4th 49, 81, 163 Cal.Rptr.3d 804 (2013) (quoting *Smith v. State Farm Mutual Automobile Ins. Co.*, 93 Cal.App.4th 700, 719, 113 Cal.Rptr.2d 399 (2001)). A second rule, arguably a gloss on the first, "require[s] that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." *Id.* (quoting *Scripps Clinic v. Superior Court*, 108 Cal.App.4th 917, 940, 134 Cal.Rptr.2d 101 (2003)). A third provides that "[a]n act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could

*Gen. Motors Corp.*, 496 F.Supp.2d 1088, 1098

reasonably have avoided." *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal.App.4th 1544, 1555, 62 Cal.Rptr.3d 177 (2007).

 Even under the third standard, which is arguably the most lenient, Plaintiff's claims fail. The limited scope of PES functionality gives consumers the benefit of being able to lock their car doors when the doors are closed, even if there is a key fob inside the car. That benefit manifests when people get in the car to drive, or when individuals lock the car to protect themselves from something outside. The benefit is substantial, and clearly outweighs the injury to consumers arising from a less than average risk that a child locks themselves in the Ghibli (as noted above, the PES precludes one of the various pathways for such an occurrence). In addition, this injury is one that a consumer could reasonably avoid.

## IV. CONCLUSION

For the foregoing reasons, Maserati's motion for summary judgment is GRANTED.