Filed 6/29/21  Yebba v. AHMC Healthcare CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSHUA YEBBA, | |
| Plaintiff and Appellant, | G058817 |
| v. | (Super. Ct. No. 30-2018-01024090) |
| AHMC HEALTHCARE INC. et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Glenda Sanders, Judge.  Affirmed.

Carpenter Law and Gretchen Carpenter; Law Office of Barry Kramer and Barry L. Kramer for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Fred R. Puglisi, Sascha Henry, Jay T. Ramsey and Andrea N. Feathers for Defendants and Respondents.

## INTRODUCTION

Joshua Yebba appeals from a judgment dismissing his complaint against AHMC Healthcare, Inc., and AHMC Anaheim Regional Medical Center, LP (collectively, the Hospital), after the trial court sustained the Hospital's demurrer to the third amended complaint without leave to amend and entered a judgment of dismissal. Yebba alleged that the Hospital violated California's Unfair Competition Law (UCL) and its Consumer Legal Remedies Act (CLRA) when it did not disclose a separate fee for an emergency room visit before treating him.[1] He alleged he would have gone elsewhere for treatment if he had known of this extra charge. He sued on behalf of himself and all others similarly situated.

The trial court sustained the demurrer on the grounds that the Hospital had no duty to disclose the separate emergency room visit fee to Yebba before treating him and that the allegations of his CLRA cause of action did not fit any of the subparts of the Act. The court also dismissed Yebba's declaratory relief cause of action, holding that it was dependent on the two statutory claims.

The main issue in this case is whether the Hospital had a duty to disclose its emergency room visit fees to Yebba (and to its other patients) before treating him (and them) and violated the UCL and CLRA by not doing so. The Hospital argues it fulfilled any duty to disclose by complying with Health & Safety Code section 1339.51.[2] Yebba

---

[1] The fee was in addition to charges for specific services or treatment items. Yebba refers to this fee as a "surcharge."

[2] Health and Safety Code section 1339.51 provides, "(a) [¶] (1) Beginning July 1, 2004, a hospital, as defined in paragraph (2) of subdivision (b), shall make a written or electronic copy of its charge description master available, either by posting an electronic copy of the charge description master on the hospital's Internet Web site, or by making one written or electronic copy available at the hospital location.

"(2) A small and rural hospital, as defined in Section 124840, shall be exempt from paragraph (1).
"(b) For purposes of this article, the following definitions shall apply:
"(1) 'Charge description master' means a uniform schedule of charges represented by the hospital as its gross billed charge for a given service or item, regardless of payer type.
"(2) 'Hospital' means a hospital, as defined in subdivision (a), (b), or (f) of Section 1250, that uses a charge description master.
"(3) 'Office' means the Office of Statewide Health Planning and Development.

contends the Hospital had a duty to tell *him* personally what the emergency room visit fee was going to be when he signed in, or at least to post a sign in the emergency room listing the fees for an emergency room visit, so that he could decide to stay for treatment or go somewhere cheaper.

We affirm the judgment of dismissal. The Legislature has spoken as to the information about pricing a hospital must disclose to its patients and how to go about disclosing it. Increasing these requirements – as Yebba advocates – upsets the legislative balance between the consumers' right to information and the hospitals' burden of providing it. Yebba does not allege that the Hospital failed to comply with the legislative notice requirements, and we cannot add to these requirements on pain of liability for unfair competition. Likewise, Yebba has failed to state a cause of action under the CLRA subdivisions he has identified. Although concealment may, in some circumstances, violate the statute, Yebba has not alleged these circumstances.

## FACTS

Yebba sued the Hospital for violation of the URL, violation of the CLRA, and declaratory relief, claiming that the Hospital had not informed him about a separate fee, independent of treatment charges, for visiting the Hospital's emergency room prior to treating him. He also alleged a cause of action for declaratory relief. The Hospital demurred to Yebba's third amended complaint, and the court sustained the demurrer without leave to amend.

Relying on *Nolte v. Cedars-Sinai Medical* Center (2015) 236 Cal.App.4th 1401 (*Nolte*), the court found that the Hospital had no specific duty to disclose the emergency room visit fee to Yebba at the time he sought treatment. Because it had no

---

"(c) The hospital shall post a clear and conspicuous notice in its emergency department, if any, in its admissions office, and in its billing office that informs patients that the hospital's charge description master is available in the manner described in subdivision (a).

"(d) Any information about charges provided pursuant to subdivision (a) shall include information about where to obtain information regarding hospital quality, including hospital outcome studies available from the office and hospital survey information available from the Joint Commission for Accreditation of Healthcare Organizations."

3

such duty, Yebba could not state a cause of action under any prong of the UCL – unlawful, unfair, or fraudulent.  As for the CLRA, Yebba failed to allege facts bringing his failure to disclose allegations within the subdivisions of the Act the Hospital had allegedly violated.  In addition, the circumstances of cases Yebba cited to support his CLRA claim did not resemble the circumstances alleged in the third amended complaint.

Judgment of dismissal was entered on November 5, 2019.  We review the trial court's ruling sustaining a demurrer independently. (*McCall v. PacifiCare of Cal., Inc*. (2001) 25 Cal.4th 412, 415.)

## DISCUSSION

### I.                      UCL

The purpose of the UCL is "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented."  (Bus. & Prof. Code, § 17001.)  The law prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]"  (Bus. & Prof. Code, §§ 17200, 17203, 17204.)  An "unlawful" act or practice is "anything that can properly be called a business practice and that at the same time is forbidden by law." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co*. (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).)   A "fraudulent" act or practice is one likely to deceive the public.  (*Shaeffer v. Califia Farms, LLC* (2020) 44 Cal.App.5th 1125, 1135.)

4

The definition of an "unfair" act or practice after *Cel-Tech* has taken three directions.[3] This district uses the definition of unfair articulated in *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854: "[W]here a claim of an unfair act or practice is predicated on public policy, . . . the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." (See *Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 613 and cases cited; *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940.)

Yebba based his UCL allegations on the Hospital's purported duty either to post a sign in the emergency room listing the six levels of emergency room care (brief to critical) and their attendant fees or to tell patients at registration that they would be charged one of these fees in addition to the fees for whatever treatment they received. He contends failing to do this was an unfair business practice. (Yebba characterized this conduct as "concealing" the emergency room visit fee.) It was unfair because it violated

---

[3] The *Cel-Tech* court found the definitions of unfairness in prior cases "too amorphous" to serve as guides to court and businesses. (*Cel-Tech, supra*, 20 Cal.4th at p. 185.) "[T]o guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Id.* at pp. 186–187, fn. omitted.) The *Cel-Tech c*ourt made it clear, however, that its "unfairness" definitions did not apply "to actions by consumers[.]'" (*Id.* at p. 187, fn. 12.)

Consequently, a split of authority developed among the Courts of Appeal regarding the appropriate test for an "unfair" business act or practice in a consumer action. One line of cases applied a pre-*Cel-Tech* balancing test for determining whether a business practice is unfair; the court examines the practice's ""'impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . [Citations.]" . . . [A]n "unfair" business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [Citation.]' [Citation.]" (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718–719.) A second line of cases adopted the test from section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(n)): "(1) [t]he consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." (*Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403.) A third line applied the same test for unfairness in consumer UCL actions that the *Cel-Tech* court had applied to actions between competitors. "[W]here a claim of an unfair act or practice is predicated on public policy, . . . the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." (*Gregory v. Albertson's, Inc*. (2002) 104 Cal.App.4th 845, 854.)

5

the CLRA and was both unexpected and undisclosed.  It was also an unlawful business practice because it violated the CLRA.  It was deceptive because the Hospital concealed the fact that emergency room patients would have to pay a fee in addition to the charges for their treatment.

The policy underlying this requirement, as stated by Yebba, is that "the costs of goods and services are a major consideration for virtually all consumers, particularly when there are far less costly alternative services to an emergency room that may be available, such as an urgent care clinic or a private doctor's office.  [¶] . . . [¶] Indeed, often a prospective patient with a minor medical problem such as someone who simply needs a note for work or school, or how needs a prescription filled, or who suffers a chronic bronchitis flareup, goes to the emergency room out of convenience.  If informed of the emergency room's minimum charge of $383.00 in addition to the physician fees and any individual items of service and treatment, these consumers might well decide to seek less expensive treatment elsewhere, or perhaps try some over the counter medicine."  "Pricing transparency and informed consent are critical issues in today's healthcare marketplace, and patients presenting at Hospital's emergency room have an absolute right to know that they will be charged a hefty . . . fee as a result of being seen in the emergency room, so they can make an informed decision as to whether to remain despite the expense or leave and seek less costly treatment elsewhere (such as a much less expensive urgent care center) . . . ."

The Legislature agrees with Yebba regarding the importance of "pricing transparency" and of providing consumers, among others, with the means of making informed choices.  That is the policy underlying the Payers' Bill of Rights, enacted in 2003 and effective July 1, 2004.  Health & Safety Code section 1399.51 is part of the Payers' Bill of Rights.

In February 2003, a series of legislative hearings revealed that the Tenet Healthcare Corporation hospital chain was using a secret chargemaster to gouge

6

Medicare, private insurers, and CalPERS.[4]  Tenet would secretly raise prices and then, months after medical services had been rendered to the insureds, it would bill the insurers at these inflated rates.  (Assem. Com. on Health, Analysis of Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended April 24, 2003, pp. 1-5; Assem. Conc. Sen. Amends. to Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Sept. 2, 2003, pp. 1-4.)

Where health insurers really felt the pinch was in Medicare "outliers" and private insurers' "stop-loss" cases.  Both Medicare and private insurers usually pay hospitals at a flat per-day rate, until a certain dollar threshold is reached.  If a patient has some unusual complications resulting in higher than normal charges, then the outlier or stop-loss provisions come into play.  Instead of a flat rate, Medicare or the insurer pays a percentage of the bill.  The higher the charges, the sooner the outlier or stop-loss threshold is crossed, and the more money the hospital recoups.  (Assem. Com. on Health, Rep. on Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 24, 2003, p. 3.)

The bill's purpose was to "provide patients, health plans and health care purchasers with more information about charges for hospital care.  The author states that this bill will also discourage hospitals from playing games with hospital pricing in a way that gouges private payers and patients."  (Assem. Com. on Health, Rep. on Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 24, 2003, p. 2.)  "Supporters of this legislation argue that it will assist consumers in making informed choices between health providers."  (Assem. Com. on Health, Rep. on Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 24, 2003, p. 2.)

As originally proposed in February 2003, the bill "would prohibit a health facility from making a material change in a charge description master more than once in a

---

[4]     "Charge description master" is usually abbreviated to "chargemaster."
A chargemaster rate has been likened to the sticker price of an automobile or the rack rate of a hotel room.  (Assem. Com. on Health, Rep. on Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 24, 2003, p. 2.)  Medicare and private insurers negotiate with hospitals to get discounts, so only the uninsured pay chargemaster rates for hospital services.  (Assem. Com. on Health, Rep. on Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 24, 2003, p. 4.)

7

calendar year, except as specified. The bill would define charge description master and material change for these purposes. [¶] This bill would require a health facility that uses a charge description master to provide a written copy, free of charge, to any person upon request, and to take other specified actions." (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as introduced Feb. 21, 2003.) A later version also required "a hospital to post a notice, as specified, that informs patients that the hospital's charge description master is available on request." (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 7, 2003.) Then the requirement was changed to "a written or electronic" copy of the chargemaster, "segregated by types of services provided." "If the hospital has an Internet Web site on which it posts its charge description masters, it may comply with this section by providing the requester with the Internet Web site address." (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 24, 2003.) This version added the requirement that "[t]he hospital shall post a clear and conspicuous notice in its emergency department, if any, in its admissions office, and in its billing office that informs patients that the hospital's charge description master is available upon request." (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Apr. 24, 2003.)

The requirement that the hospital hand out copies of the chargemaster on request was changed in July 2003. Instead of providing a written or electronic copy free of charge, the hospital had to "make available for inspection onsite a written or electronic copy to any person on request[.]" (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended July 16, 2003.)

Another change was made in September. Now the hospital had to make a written or electronic copy available "in accordance with specified provisions." (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Sept. 2, 2003.) The hospital had to (1) "make a written or electronic copy of its charge description master available, either by posting an electronic copy of the charge description master on the hospital's Internet Web site, or by making one written or electronic copy available at the hospital location"

8

(Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Sept. 2, 2003) and (2) "post a clear and conspicuous notice in its emergency department, if any, in its admissions office, and in its billing office that informs patients that the hospital's charge description master is available in the manner described in subdivision (a)." (Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended Sept. 2, 2003.) The bill passed in this form in September 2003.[5] (Assem. Bill No. 1627, approved by the Governor, Sept. 28, 2003.)

One of the arguments against the bill in its earlier form was that "the resources a hospital would have to use to answer inquiries about its chargemaster would be tremendous and the costs of providing paper or electronic chargemaster copy to everyone who requests it would be substantial." (Sen. Health and Human Services Com., Analysis of Assem. Bill No. 1627 (2003-2004 Reg. Sess.) as amended July 9, 2003, p. 5.) The later versions of the bill eliminated the requirement that the hospital furnish copies of the chargemaster on request.

To summarize, although earlier versions of the bill required hospitals to hand out written copies of the chargemaster to patients on request, the final version required hospitals only to post their chargemasters on their web sites or make a written or electronic copy available at the hospital itself. In addition, the bill required hospitals to post a notice in the emergency room, the admissions office, and the billing office about the availability of the chargemasters.

As the discussion of the legislative history demonstrates, Yebba's public policy basis for his UCL claim is "tethered" to the public policy underlying Health & Safety Code section 1339.51. In fact, as they apply to patients, the two policies are identical. The problem is that the Legislature thoroughly considered the benefits of providing information about hospital charges "to assist consumers in making informed

---

[5] The Payers' Bill of Rights also includes Health & Safety Code section 1339.56, which now requires a hospital to compile a list of 25 common outpatient procedures annually and the average charge for the procedures. This list is posted on the hospital's web site and is available to any person on request.

9

choices between health care providers" and balanced these benefits against the burden on hospitals of making this information available. It has set the balance at availability on the hospital's web site and notices in various offices. Requiring additional notices to ward off liability for unfair competition would upset that balance and would amount to judicial legislating. The Hospital complied with public policy by complying with the statute set up to enforce it.

Yebba limits his complaint to the failure to disclose the emergency room visit fee – stating that a patient should know what this fee is so that he or she can decide whether to incur it or go elsewhere. But how can anyone – hospital or patient – know what the fee is going to be before the patient is treated? The Hospital has six different emergency room visit fees, depending on the severity of the patient's condition. How could the patient know how severe his condition is, and therefore which fee the Hospital will charge him, before he is treated? He might be willing to pay the $383 fee for the brief visit, but balk at $2,911 for a comprehensive visit. Likewise how could the Hospital know?

Yebba characterizes a visit to an emergency room as a transaction between a buyer and a seller. But there is a significant difference between an ordinary commercial transaction and what takes place in an emergency room. In the ordinary transaction, the buyer and the seller negotiate the terms in advance; the seller is willing to part with specific goods or provide specific services for a price both seller and buyer have agreed upon. If after the deal is done the seller tries to charge more money for the goods or services, the buyer can rightfully refuse to pay it.

When a patient goes to an emergency room, however, neither the patient nor the hospital knows in advance what goods or services will be needed. This can be determined only after the patient has been treated, that is, after the goods and services have been provided. Another difference for insured patients, such as Yebba, is that the agreement to pay for services is not solely between the patient and the hospital. The

10

health insurance company pays first, according to its agreements with the hospital and with its insured. The patient is responsible only for the portion of the bill the insurer does not pay, as mandated by the insured's own contract with the insurer. That portion is determined only after the insurance company has paid according to its contracts and cannot be known by anyone at the time the patient enters the emergency room. A sign giving the chargemaster fees for different levels of an emergency room visit would be useless as a guide to an insured patient such as Yebba for this reason as well.

Yebba argues that allowing the Hospital to fulfill a duty to disclose simply by complying with Health & Safety Code section 1339.51 provides the Hospital with a "safe harbor." He did not make this argument in his opposition to the Hospital's demurrer to the third amended complaint. In addition, the trial court never stated in its ruling that it thought the statute provided a safe harbor.

This argument assumes what it needs to prove. A safe harbor applies when a statute protects conduct that would otherwise subject the actor to liability. As our Supreme Court has said, "If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Cel-Tech, supra,* 20 Cal.4th at p. 182.) The court then proceeded to give examples of a "safe harbor." In one case, the plaintiff tried to plead around the litigation privilege of Civil Code section 47 by calling the conduct in question "unfair competition."[6] In another, the Attorney General tried to impose UCL liability on wholesalers and retailers for conduct as to which another statute

---

[6] The gravamen of the lawsuit in *Rubin v. Green* (1993) 4 Cal.4th 1187, was a claim that a law firm had solicited the plaintiff's tenants as clients in anticipation of a lawsuit against him over conditions in his mobile home park. (*Id.* at p. 1191.)

11

granted them immunity.[7]  In both cases, the *Cel-Tech* court stated that "[a] plaintiff may thus not 'plead around' an 'absolute bar to relief' simply 'by recasting the cause of action as one for unfair competition.'  [Citation.]"  (*Id.* at pp. 182-183.)  "Although the Supreme Court has construed the orbit of the unfair competition statutes expansively [citations], it cannot be said that this embracing purview also encompasses business practices which the Legislature has expressly declared to be lawful in other legislation."  (*Hobby Industry, supra,* 101 Cal.App.3d at pp. 369-370.)

Yebba's "safe harbor" argument is a good illustration of the logical fallacy of begging the question.  It assumes that not putting a list of emergency room visit fees up on the wall in the emergency room is an unfair or deceptive business practice and therefore the Hospital needs a safe harbor to avoid liability for it.  But neither the trial court nor the Hospital asserted that Health & Safety Code section 1399.51 offered the Hospital a safe harbor from what otherwise could be wrongful conduct.  They correctly found that the conduct was not wrongful.

Given that the Legislature thoroughly considered patients' need for information about hospital charges in 2003, tinkered with various notice requirements over several months, and gradually reduced what hospitals had to do to provide this information, we cannot simply assume that failing to provide additional notice is unfair.  As the court stated in *Nolte, supra,* "[T]he law does not provide . . . that Nolte had the right to have every individual charge disclosed to him in advance before Cedars issued a bill.  Cedar's obligation to Nolte and other consumers of medical services was that Cedars make a written or electronic copy of its schedule of charges available in the manner codified in section 1339.51 of the Health and Safety Code, and there is no allegation that Cedars did not do so."  (*Nolte, supra,* 236 Cal.App.4th at p. 1409.)  There

---

[7]    In *Hobby Industry Assn. of America, Inc. v. Younger* (1980) 101 Cal.App.3d 358 (*Hobby Industry*), the court ruled that immunity granted to wholesalers and retailers under Business & Professions Code section 12602, subdivision (b), in the absence of specified conditions could not be nullified by recasting the conduct as unfair competition.  (*Id.* at p. 369.)

is likewise no allegation in Yebba's third amended complaint that the Hospital failed to comply with its statutory disclosure obligations; the demurrer was properly sustained as to this cause of action.

## II.        CLRA

Yebba alleged that failing to disclose the emergency room visit fee before imposing it violated two subdivisions of the CLRA, Civil Code 1770.  These were "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (Civ. Code, § 1770, subd. (a)(5)), and "[r]epresenting that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law."  (Civ. Code, § 1770, subd. (a)(14)).  The trial court sustained the Hospital's demurrer to this cause of action because "[t]he alleged failure to notify [Yebba] of the 'surcharge' does not fall within either of these subsections."

Yebba argues that a failure to disclose can violate the CLRA even though both subdivisions refer to active misrepresentation.  This is sometimes true.  In *Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234 (*Gutierrez*), the court identified four circumstances under which a failure to disclose violates the CLRA: (1) when the defendant is the plaintiff's fiduciary, (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff, (3) when the defendant actively conceals a material fact, and (4) when a defendant makes misleading partial representations.[8]  (*Id.* at p. 1258; see also *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256.)  Yebba alleged that two of these circumstances applied to the Hospital with respect to the emergency room visit fee:  exclusive

---

[8]        It should be noted that the *Gutierrez* court considered only violations of subdivisions (a)(5), (a)(7), and (a)(9) of Civil Code section 1770.  (*Gutierrez, supra,* 19 Cal.App.5th at p. 1249.)  The court did not consider subdivision (a)(14).

13

knowledge of a material fact unknown or not accessible to the plaintiff and active concealment of a material fact.

But, as the discussion above has already established, the Hospital did not have exclusive knowledge of a material fact not accessible to Yebba, and it did not actively conceal a material fact. The material fact – the existence of an emergency room visit fee – was disclosed and available to the public, including Yebba, in accordance with the procedure mandated by the Legislature, and Yebba, like the plaintiff in *Nolte*, did not allege that the Hospital failed to comply with the statutory procedure. (*Nolte, supra,* 236 Cal.App.4th at p. 1408.) Likewise, the Hospital did not actively conceal a material fact. Yebba does not allege that the Hospital failed to post the required notices about access to the chargemaster in the places the legislature has required.

**III.        Declaratory Relief**

Yebba's declaratory relief cause of action in the third amended complaint alleged that the Hospital had a duty to disclose the emergency room visit fee before treating patients and that the Hospital denied having such a duty. The trial court sustained the Hospital's demurrer to this cause of action along with the UCL and CLRA causes of action.

Although the court did not specifically address the declaratory relief cause of action in the minute order ruling on the demurrer to the third amended complaint, it expressed its opinion in the minute order sustaining the demurrer to the second amended complaint. "Although styled as a cause of action, it is a prayer for relief dependent on [Yebba's] other two causes of action [i.e., UCL and CLRA]." Yebba was given leave to amend the declaratory relief cause of action.

The declaratory relief allegations of the third amended complaint pushed the cause of action even further into the ambit of the UCL and the CLRA. In the second amended complaint, Yebba based the controversy on the contract between himself and the Hospital, a copy of which was attached as an exhibit. In addition, he based the

14

controversy on the Hospital's alleged duty to disclose the emergency room visit fee before treatment. In the third amended complaint, however, Yebba omitted allegations about the contract and focused entirely on the duty to disclose. The bases of this duty are identical in both pleadings.

"'The object of [Code of Civil Procedure section 1060] is to afford a new form of relief where needed and not to furnish a litigant with a second cause of action for the determination of identical issues. . . . [Citation].'" (*Allstate Ins. Co. v. Fisher* (1973) 31 Cal.App.3d 391, 394; see also *Hannon v. Western Title Ins. Co.* (1989) 211 Cal.App.3d 1122, 1128-1129.) Yebba does not explain how his declaratory relief cause of action differs from his UCL and CLRA claims, also based on a duty to disclose the emergency room visit fee before treating patients. We conclude that the trial court did not abuse its discretion in dismissing this cause of action. (See *C.J.L. Construction, Inc. v. Universal Plumbing* (1993) 18 Cal.App.4th 376, 390-391 [among reasons for denying declaratory relief, separate declaratory relief action improper when issues present in other cause of action].)

## IV.  Judicial Notice

Yebba objects to the trial court's taking judicial notice of a declaration filed by his counsel as part of an earlier pleading and of the contract (conditions of admission) between himself and the Hospital, which he had attached as an exhibit to the second amended complaint and omitted from the third amended complaint. The court took judicial notice of counsel's previous representation "that 'other than its relevance to the "duty to disclose" and materiality, [Yebba] is not alleging "unconscionability" or "unreasonableness" of the amounts of [the emergency room visit fee.]' [Citation.]" The court took judicial notice of this statement as a judicial admission because in the third amended complaint, "[Yebba] repeatedly labels the charges as unreasonable." The court also took judicial notice of the second amended complaint, including the exhibit, although did not explain the reason for the judicial notice.

15

Evidence Code section 452 permits the court to take judicial notice of state court records. A court has discretion to take judicial notice of these records. (*Shine v. Williams-Sonoma, Inc.* (2018) 23 Cal.App.5th 1070, 1076.)

The court took judicial notice of counsel's previous declaration because Yebba appeared to be walking back from a prior assertion that the amount of the emergency room visit fee was *not* an issue, only the failure to disclose it ahead of time. A new allegation that the fee was "unreasonable" contradicted this assertion and formed a separate ground for a UCL cause of action, a ground that counsel had previously disclaimed.[9]

Yebba contends the declaration was not important so its relevance is unclear, and the court had no reason to take judicial notice of it. We see it differently. The purpose of taking judicial notice of the declaration was to put a stop to a new wrinkle on Yebba's UCL claim – that the fee was too high. The court did not dismiss the cause of action on the ground that the fee was de minimis. The UCL claim was dismissed because charging the fee was not unfair, unlawful, or fraudulent.

As appellant, Yebba has the burden of showing error. (See *Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 971.) Since Yebba asserts that the amount of the fee is irrelevant, the court could not have erred by taking judicial notice of a declaration by his counsel to that effect.

As for taking judicial notice of the second amended complaint, as stated above, the court did not explain why it did so. The Hospital asked the court to take judicial notice of the complaint and its exhibit to support its argument that Yebba had no standing to state either a UCL claim or a CRLA claim because he had alleged no loss of money or property (Bus. & Prof. Code, § 17204) or "any damage." (Civ. Code, § 1780, subd. (a).) The court did not sustain the Hospital's demurrer because of lack of standing,

_____

[9] In his opening brief, Yebba once again states that he is not challenging the reasonableness of the emergency room visit fee through a claim of unconscionable pricing. He simply means the fees are "material."

16

and Yebba has not explained how taking judicial notice of the complaint prejudiced him. (See *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963 [appellant must show why ruling is prejudicial].)

## DISPOSITION

The judgment of dismissal is affirmed.  Respondents are to recover their costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.

17